RALPH CONSTRUCTION, INC.,
**Plaintiff,**

v.

The **UNITED STATES, Defendant.**

No. 160–82C.

United States Claims Court.

March 23, 1984.

---

Robert A. Huffaker, Montgomery, Ala., for plaintiff; Rushton, Stakely, Johnston & Garrett, P.C., Montgomery, Ala., of counsel.

Stephanie Wickouski, Washington, D.C., with whom was Acting Asst. Atty. Gen. Richard K. Willard, Washington, D.C., for defendant.

## OPINION

MAYER, Judge.

Plaintiff Ralph Construction, Inc., brought this case under the Contract Disputes Act of 1978, 41 U.S.C. § 609(a)(1) (Supp. IV 1980), for breach of an asserted maintenance service requirements contract. The main breach alleged is that the government allocated work orders between in-house personnel and plaintiff on the basis of economic feasibility not permitted by the contract. The case is now here on defendant's motion for summary judgment and plaintiff's cross-motion for partial summary judgment.

## FACTS

Plaintiff is a Texas corporation specializing in disaster relief services for state and federal agencies and maintenance services for governmental entities. In the spring of 1980, the Directorate of Facilities and Engineering (DFAE) at Fort Rucker, Alabama, sought bids for a contract to perform routine maintenance services at housing facilities at Fort Rucker. These services had previously been performed in-house by government personnel. The contract to be let here was the first one for services to be performed by a private contractor.

The government calculated its "best estimates" of the work tasks to be required of the successful bidder based on completed service orders and work orders performed by government personnel during the 12-month period preceding the issuance of the solicitation. Separate line items specified the government's estimate of the quantities of supplies and services the contractor could be required to provide. Bidders were required to insert a unit price for each line item.

Plaintiff was the low bidder and was awarded the contract on a bid of $411,619.21. The estimates were incorporated in the contract awarded plaintiff in a "unit price schedule." The contract also contained the following provision:

(a) This is a requirements contract for the supplies or service specified in the schedule, and for the period set forth therein. Delivery of supplies or performance of services shall be made only as authorized by orders issued in accordance with the clause entitled "Ordering". The quantities of supplies or services specified herein are estimates only, and are not purchased hereby. These quantities are not the total requirements of the activity named in the Schedule; they are estimates of requirements in excess of the quantities which such activity may itself furnish within its own capabilities. Except as may be otherwise provided herein, in the event the Government's requirements for supplies or services set forth in the Schedule do not result in orders in the amounts or quantities described as "estimated" or "maximum" in the Schedule, such event shall not constitute the basis for an equitable price adjustment under this contract.

(b) Except as otherwise provided in this contract, the Government shall order from the Contractor all the supplies or services of the Government activity named in the Schedule in excess of the quantities which the activity may itself furnish within its own capabilities.

Plaintiff began performance of the contract in August of 1980, a time when there was a backlog of maintenance work. The government initially adopted a policy of assigning plaintiff all backlog work covered by the contract not already assigned to

government employees and, after August 25, 1980, of assigning plaintiff all service orders called into DFAE,* which had the responsibility of assigning work. It appears, however, that the policy was not faithfully followed by DFAE employees and some tasks continued to be assigned to in-house personnel. During the initial period, in-house personnel performed tasks that had been assigned before August 25, as well as work not covered by the contract, emergency work after 1:45 p.m. which plaintiff could not accept, and work during non-duty hours.

In the latter part of January 1981, the Director of DFAE noted that in-house personnel had completed most of the backlog work assigned them before August 1980 and were now available for current maintenance problems. He also concluded that if work assignments to plaintiff continued at the same pace, the contract price would be exceeded. He instructed these workers to perform some of the work rather than assigning it all to plaintiff.

A new policy of assigning work on the basis of cost effectiveness was therefore implemented. From approximately mid-February of 1981 until mid-April, if the estimated quantity of a line item in the unit price schedule had been met or exceeded, additional work on the line item would be assigned between plaintiff and in-house personnel on the basis of cost efficiency. If the line item could be done more cheaply in-house than by plaintiff, it would be assigned in-house.

Apparently this policy was not adhered to by DFAE employees either. They maintained no written schedule or log to determine if plaintiff had been assigned 100% of a line item. Certain profitable line items continued to be assigned to in-house personnel even though plaintiff had not been assigned 100% of the estimated quantities. At the same time, work orders for low or non-profit items were not infrequently assigned to plaintiff in excess of the estimates in the contract.

The Director of DFAE had not consulted with the contracting officer when he made the assignment policy changes. In April of 1981, the contracting officer advised DFAE that assignment of work tasks on the basis of economy was not permissible under the terms of the contract and that it violated the provision of the contract quoted above. Accordingly, the government again changed its work assignment policy so that all work covered by the contract not already assigned in-house would be assigned to the contractor, again except for emergency work after 1:45 p.m. and work during non-duty hours. Upon completion of the contract, a total of $357,900.25 was billed in accordance with the unit price schedule, $53,718.96 less than the bid price.

Plaintiff filed a certified claim with the contracting officer asking $40,096.93, primarily in compensation for work it would have received but for the assignment of that work to government employees. The claim also sought payment for work the government allegedly paid under an incorrect line item; for situations in which plaintiff says it was instructed to return to a work site to complete or correct repairs which were in fact done correctly ("go backs"); and for material and repair items plaintiff says it ordered at the direction of a government official, but for which it was not paid. The claim was denied.

In this court, plaintiff asks for $77,844.88 in damages. On top of the compensation sought in its claim certified to the contracting officer, it now seeks recovery for loss of efficiency and productivity in the amount of $36,071.85. It also has significantly increased its claim in connection with "go backs."

## CONTENTIONS

Plaintiff's position is that this contract is either a requirements contract or an indefinite quantities contract with a guaranteed minimum. The guaranteed minimum of supplies and services to be ordered by the

---

* The name of this directorate was changed in this period, but the functions remained the same and it will be referred to as DFAE throughout.

government are those estimated in the contract. Plaintiff contends the contract was breached when the government made work assignments on the basis of cost effectiveness, and because the government's estimates of requirements were unreasonable.

Defendant counters that the court lacks jurisdiction over that part of plaintiff's claim that was neither certified nor submitted to the contracting officer. As for the breach claim, assignment of in-house personnel is expressly permitted by the contract and the estimated quantities contained in the contract were the government's good faith estimates. The contract does not require all of the government's work to be assigned to plaintiff and it says the estimated requirements are not guaranteed as a minimum.

## DISCUSSION

■ A supply and services contract like this one falls into one of three categories. It may be a contract for a definite quantity, one for an indefinite quantity, or one for requirements. *Torncello v. United States,* 681 F.2d 756, 761 (Ct.Cl.1982); *Mason v. United States,* 615 F.2d 1343, 1347 (Ct.Cl. 1980). A definite quantity contract requires that a fixed, definite quantity of goods or services be purchased and provided. *See* 615 F.2d at 1347. This is not a contract of that type and neither party suggests it is.

■ Contrary to plaintiff's view, this is also not a requirements contract. A contract of that type requires that the contractor have the exclusive right and legal obligation to fill all of the government's needs for work of the kind described in the contract and that the government will purchase those needs from no one other than the contractor. *Mason v. United States,* 615 F.2d at 1346; *see also Inland Container, Inc. v. United States,* 512 F.2d 1073, 1076–77 (Ct.Cl.1975). Notwithstanding that the contract says, "This is a requirements contract ...;" the parties stipulated that this was a requirements contract; and the contracting officer and representatives of DFAE considered the agreement to be a requirements contract, it contains none of the elements necessary to that result. Definition of the contract is a question of law, *see Torncello v. United States,* 681 F.2d at 760; the parties may not stipulate to it in derogation of the court's function. *See L'Enfant Plaza Properties, Inc. v. United States,* 3 Cl.Ct. 582, 593 (1983); *Hegeman-Harris & Co. v. United States,* 440 F.2d 1009, 1012 (Ct.Cl.1971). The court is not bound by what the contract is called, it must look to the terms in deciding what it is. *See, e.g., Torncello v. United States,* 681 F.2d at 760; *Mason v. United States,* 615 F.2d at 1346–47. And the understanding and actions of officials administering the contract are not dispositive. "An accumulation of mistaken interpretations cannot serve to vary the contract if it is clear." *Salem Engineering & Construction Corp. v. United States,* 2 Cl.Ct. 803, 808 (1983).

This is an indefinite quantities contract which contains only an estimate of the government's requirements, no minimum quantity. It reserves to the government the right to assign the work elsewhere. It is a contract like that addressed in *Willard, Sutherland & Co. v. United States,* 262 U.S. 489, 493, 43 S.Ct. 592, 594, 67 L.Ed. 1086 (1923), where the Supreme Court said, "There is nothing in the writing which required the government to take, or limited its demand, to any ascertainable quantity. It must be held that, for lack of consideration and mutuality, the contract was not enforceable." This principle was controlling in *Torncello v. United States,* in which it was said that "it is the very essence of a requirements contract ... that the buyer agree to turn to the supplier for all of its needs. If there is not a commitment for *all* needs, then the relation is not different from an indefinite quantities contract with no required minimum, the very type of relation that the Supreme Court held in *Willard, Sutherland & Co.,* could not be a contract." 681 F.2d at 768. The clear language of this contract permitted the government to assign work in-house; it explicitly did not require assignment of all work to plaintiff.

■ It is true, as plaintiff says, that if a contract is susceptible of interpretation as either an indefinite quantities without minimum agreement or as one for requirements, the court should uphold it as of the requirements type. See *E.H. Sales, Inc. v. United States,* 340 F.2d 358 (Ct.Cl.1965); *Goldwasser v. United States,* 325 F.2d 722 (Ct.Cl. 1963). It cites the *Torncello* case as one where the court opted for that solution. There, the contractor agreed to provide grounds maintenance and refuse removal services at a government installation. Among the unit price items in the contract was one for pest control, in which the contractor had a large profit margin. The government concluded it could perform pest control cheaper and therefore refused to order this service, performing it in-house instead. The court said,

> "[W]e must and do conclude that plaintiff's contract is for the Navy's requirements.... [I]t is clear that the Navy wanted someone, a single contractor, to take on the comprehensive task of providing grounds maintenance and refuse removal at the six housing projects covered by the contract. The Navy wanted to have to deal with only one contractor and executed a contract that was intended to obligate that one contractor for all of the tasks needed." 681 F.2d at 762.

The difficulty with plaintiff's reliance on *Torncello* is that here the contract permitted just the opposite. The supplies and services covered were not all the installation would need. The contract clearly says, "[T]hey are estimates of requirements in excess of the quantities which such activity may itself furnish within its own capabilities." Put another way, it says, "Except as otherwise provided in this contract, the government shall order from the contractor all the supplies or services of the government activity named in the schedule in excess of the quantities which the activity may itself furnish within its own capabilities."

Plaintiff suggests that even if this is an indefinite quantities agreement, it is not unenforceable because of illusory considera-

tion from the government or the absence of mutuality. It says a guaranteed minimum purchase amount is inherent in any indefinite quantities contract, and the guaranteed minimum is the amount ascribable to the government's estimates of tasks to be required during the term of performance.

Plaintiff relies principally on *Mason v. United States,* 615 F.2d 1343, in which a contract containing estimated needs for construction projects in a certain geographical area and assigning a fixed price for each project was at issue. That contract contained a provision similar to ours cautioning that the estimates were not guaranteed minimums or maximums and were not intended to indicate required quantities or the scope of the work expected. *Id.* at 1345. But it also contained a clause specifying a minimum quantity of work for which the contractor would be paid a stated amount. *Id.*

The court rejected a claim that the contract was of the requirements type which was breached when defendant assigned work to others, holding it was instead an indefinite quantities agreement. It emphasized the explicit guaranteed minimum provision and explained that it made the contract enforceable and compensated contractors for their bid preparation expenses. *Id.* at 1349–50. If there were no provision to that effect, contractors would have no assurance of receiving any work under the contract, not even enough to cover their bid preparation costs. Aside from the enforceability problem of an indefinite quantities contract, a guaranteed minimum is an inducement for contractors to bid and serves the interests of both parties. The court said, "Logically then, since it wants to receive bids, we can assume that in all its contracts the Government takes steps to ensure this minimal amount of work." *Id.* at 1349.

In this case, the government assigned more than a minimal amount of work, but there was no guaranteed minimum provision in the contract as in *Mason.* Even if the court were to agree with plaintiff that *Mason* implies a guaranteed minimum term

ensuring recovery of bid preparation costs in all government contracts, a dubious proposition, that is not what plaintiff is asking for. It wants the guaranteed minimum to be the estimates the government set out in the contract, but *Mason* cuts the other way.

This contract clearly and repeatedly stated that not only was the anticipated work based on the government's best estimate, but that the government reserved the right to use its existing work force to perform whatever work it could. This reserved right was unqualified. The court cannot now rewrite a provision so clearly stated in the guise of interpretation.

 Nothing suggests that assignment of work on the basis of cost effectiveness was impermissible. The contract contains no limitation on the government's assignment and performance of work in-house. In the face of this unfettered discretion, it was not unreasonable to base its choices on cost effectiveness. No intent to injure plaintiff by administering the contract on this basis has been shown; it would require a significant showing of bad faith or malice to rebut the presumption that the government was acting other than in good faith. *P. Francini & Co. v. United States*, 2 Cl.Ct. 7, 11 (1983); *Torncello v. United States*, 681 F.2d at 770. Plaintiff's burden would be heavy indeed given the discretionary terms of the contract.

 Similarly, the complaint about the disparity between the government's estimates and the actual quantities of supplies and services ordered is without merit. The government need only exercise reasonable care in preparation of estimated quantities, *see Chemical Technology, Inc. v. United States*, 645 F.2d 934, 946–48 (Ct.Cl.1981); *Womack v. United States*, 389 F.2d 793, 802 (Ct.Cl.1968); the estimates need not be mathematically perfect, *see Clearwater Forest Industries, Inc. v. United States*, 650 F.2d 233, 239 (Ct.Cl.1981). Here, there had been no previous contract so the government considered the preceding years' service orders and anticipated future needs on that basis. Absent any allegation or evidence that the estimates were accomplished in bad faith, and in the face of the presumption to the contrary, there is no basis for relief merely because the actual work did not meet the estimate.

 In any event, the unfettered right of the government to perform work in-house renders the contract unenforceable because of the lack of mutuality of consideration. It is valid only to the extent it was performed, *Willard, Sutherland & Co. v. United States*, 262 U.S. at 494, 43 S.Ct. at 594, and plaintiff is entitled only to the compensation agreed upon in the contract attributable to the work done, *see generally Tennessee Soap Co. v. United States*, 126 F.Supp. 439 (Ct.Cl.1954), because the reasonable value of the work is measured by the contract price. *See Urban Data Systems v. United States*, 699 F.2d 1147, 1155 (Fed.Cir.1983); *Pacific Maritime Association v. United States*, 108 F.Supp. 603, 607 (Ct.Cl.1952). It is not entitled to additional costs or anticipatory profits. *See Yosemite Park & Curry Co. v. United States*, 582 F.2d 552, 561 (Ct.Cl.1978); *Cities Service Gas Co. v. United States*, 500 F.2d 448, 457 (Ct.Cl. 1974).**

Therefore, plaintiff has been paid all it is due except, perhaps, for two of the remaining claims which appear to be for additional compensation under the contract to the extent it was performed. Plaintiff says the contracting officer directed payment for some materials under the wrong line item, and denied plaintiff additional payment for erroneously ordered "go backs." On this record, the court cannot tell whether the contracting officer was right or not. The parties continue to argue over the facts necessary to a conclusion, and this makes these claims inappropriate for summary judgment. *See* RUSCC 56. Further proceedings will be necessary to resolve them.

** In light of this discussion, it is unnecessary for the court to reach defendant's assertion that the court has no jurisdiction over the portion of plaintiff's claim which was neither certified nor submitted to the contracting officer.

Finally, as a separate claim only indirectly related to the contract, plaintiff seeks payment for certain materials which it says were ordered at the direction of a government official for installation in the buildings. Upon delivery of the materials, however, the government refused to either permit their installation or pay for them. Defendant retorts that the employee who allegedly directed plaintiff to order the materials had no contracting authority and that the government did not benefit from the order.

The standard rule is that one who contracts with the government is responsible for determining that the officials with whom he deals have contracting authority. *Federal Crop Insurance Corp. v. Merrill*, 332 U.S. 380, 384, 68 S.Ct. 1, 3, 92 L.Ed. 10 (1947); *Housing Corp. of America v. United States*, 468 F.2d 922, 925 (Ct.Cl. 1972). If they do not, they cannot obligate the government. *Yosemite Park & Curry Co. v. United States*, 582 F.2d at 558. To defendant's evidence that the employee involved had no contracting authority, plaintiff only responds that he had responsibilities in the administration of the contract. This does not overcome defendant's defense. *See Campbell v. United States*, 2 Cl.Ct. 247, 249 (1983).

Nor is this a case where responsible officials acquiesced in the ultra vires actions of an employee, like in *Gresham & Co. v. United States*, 470 F.2d 542, 555 (Ct.Cl.1972), cited by plaintiff, or accepted the benefits of them, *see Trans Ocean Van Service v. United States*, 426 F.2d 329, 347–48 (Ct.Cl.1970). There is no evidence the contracting officer was aware of this order and it is not disputed that the government refused to use the materials and they were still on hand at the end of the performance period. Of course, to the extent plaintiff asserts a contract implied in law, this court has no jurisdiction. *Southern States Henry Co-operative, Inc. v. United States*, 4 Cl.Ct. 370, 372–73 (1984); *Aetna Casualty & Surety Co. v. United States*, 655 F.2d 1047, 1059 (Ct.Cl.1981). Defendant, therefore, prevails on this claim.

## CONCLUSION

Accordingly, defendant's motion for summary judgment is granted in part, and plaintiff's cross-motion for partial summary judgment is denied.

It is so **ORDERED**.