MODERN SYSTEMS TECHNOLOGY
CORPORATION, Plaintiff–
Appellant,

v.

The UNITED STATES, Defendant–
Appellee.

No. 92–5037.

United States Court of Appeals,
Federal Circuit.

Oct. 27, 1992.

Thomas R. Nedrich, Thomas R. Nedrich & Associates, Falls.Church, Va., argued for plaintiff-appellant; Sheldon I. Matzkin, of counsel.

Mark E. Dennett, Atty., Office of Contracts and Property Law, U.S. Postal Service, Washington, D.C., argued for defendant-appellee.

Before NIES, Chief Judge, MAYER and SCHALL, Circuit Judges.

MAYER, Circuit Judge.

Modern Systems Technology Corporation appeals the judgment of the United States Claims Court that the Basic Pricing Agreement between the United States Postal Service and Modern Systems Technology Corporation creates no contractual obligations. 24 Cl.Ct. 360 (1991). We affirm on the basis of the trial court's opinion set out in the appendix which we adopt.

AFFIRMED.

## APPENDIX

Adopted portion of the United States Claims Court opinion:

BRUGGINK, Judge.

Plaintiff, Modern Systems Technology Corporation ("MSTC"), alleges that defendant, the United States Postal Service ("Postal Service"), is in breach of a contract with MSTC and seeks an award for the alleged contract price, plus interest, costs and attorney's fees. Defendant moves for summary judgment, alleging that there is no genuine issue as to any material fact and that MSTC is precluded from recovery as a matter of law.

## BACKGROUND

On October 1, 1987, the Postal Service entered into a Basic Pricing Agreement ("BPA") with Rolm Mid–Atlantic. Under the BPA, Rolm Mid–Atlantic was "to provide moves, adds and changes to the telephone system as required for the [Postal Service] Management Academy" from October 5, 1987 through October 4, 1989 at a price not to exceed $27,500.00. The need for such work arises whenever the telephone system has to be modified to accommodate new employees or the internal relocation of existing personnel. The BPA provided that "[t]he Postal Service is obligated only to the extent of authorized orders actually placed against this funded Basic Pricing Agreement."

A year and a half later, while the Rolm Mid–Atlantic BPA was still in effect, the Postal Service entered into a BPA with plaintiff MSTC for essentially the same services. This BPA, which is the subject of this litigation, was dated March 10, 1989, and covered the period from March 10, 1989, through March 9, 1991. MSTC was to "[p]rovide moves, adds and changes (MAC's) and additional/replacement instruments and non-PBX maintenance" at the Management Academy. The total amount billed to the Postal Service under the BPA was not to exceed $25,000.

Similar to the Rolm BPA, the MSTC BPA provided that "[t]he Postal Service is obligated only to the extent of individual authorized orders actually placed under this agreement. Each order that the Postal Service places and the contractor accepts becomes an individual contract." No orders have ever been issued to MSTC under this document.

On or about March 13, 1989, the Postal Service and MSTC entered into a one year Full Service Maintenance ("FSM") Agreement for other work to be performed at the Postal Service Management Academy. MSTC alleges that on March 30, 1989, the Postal Service orally communicated its intention to terminate the FSM agreement for convenience. MSTC has contested the termination of the FSM in a separate suit in this court. In the present case, MSTC contends that the Postal Service, in retaliation for MSTC's refusal to agree to the termination of the FSM agreement, has diverted its MAC work to another contractor and away from MSTC.

MSTC claims that the BPA between MSTC and the Postal Service is a requirements contract, and that the Postal Service has breached that contract by ordering its MAC work from another contractor, namely Data Communications Systems Corporation ("Data Communications").[1] Thus, MSTC seeks damages in the amount of $25,000.00, which is the maximum amount MSTC could have received from the Postal Service for work ordered under the BPA.

The Postal Service seeks summary judgment on the basis that the BPA does not reflect an intent by the parties to enter into contractual obligations, and that even if it did, such a contract would fail for lack of a quantity term. As to the latter point, the Postal Service contends that the BPA is not a requirements contract. MSTC opposes defendant's motion for summary judgment on the ground that there are material facts

---

1. On April 25, 1989 the Postal Service issued a BPA to Data Communications for parts and repair service for Teltone communications systems at the Postal Service Management Academy for the inclusive dates of 4/25/89–4/24/91. The Data Communications BPA also provided that "[t]he Postal Service is obligated only to the extent of individual authorized orders actually placed under this agreement. Each order that the Postal Service places and the contractor accepts becomes an individual contract."

in dispute with respect to terms of the contract and the parties' intentions.

The issue before the court is whether the March 10, 1989, BPA constitutes a binding contract, and if so, whether the failure of the Postal Service to make orders under the agreement constitutes a breach. For the reasons set forth below, the court finds that the BPA did not create any contractual obligations. Because there are no relevant facts in dispute, defendant's motion for summary judgment must be granted.[2]

## DISCUSSION

■ Two issues of contract formation are raised by the Postal Service's motion. First, whether the parties intended to create binding obligations, and second, whether the terms of the contract are sufficiently definite to permit determination of breach and remedies. *See Aviation Contractor Employees, Inc. v. United States*, 945 F.2d 1568, 1572 (Fed.Cir.1991). In the absence of contractual intent or sufficiently definite terms, no contractual obligations arise. For the following reasons, the court holds that the BPA at issue does not create binding rights and obligations.

Our inquiry into the existence of contractual intent begins with an examination of the BPA itself. Paragraph 2 provides that the "[c]ontractor will furnish the following when requested by the contracting officer or designated representatives: Provide moves, adds and changes (MAC's) and additional/replacement instruments and non-PBX maintenance." Paragraph 4 of the BPA provides: "Prices to the Postal Service must be as low or lower than those charged the contractor's most favored customer for comparable quantities under similar terms and conditions, in addition to any discounts for prompt payment." From these paragraphs, MSTC argues that:

> MSTC *must* furnish MAC services *whenever* the Postal Service requests them,

and MSTC *must* provide those services at the lowest prices charged by MSTC. In other words, MSTC has no option with respect to whether or not it will provide the MAC services when called upon by the Postal Service.

Plaintiff's Opposition to Defendant's Motion for Summary Judgment at 14 (emphasis in original). The difficulty with this conclusion is that the BPA also recites at paragraph 3 that "[t]he Postal Service is obligated only to the extent of individual authorized orders actually placed under this agreement. Each order that the Postal Service places and the contractor accepts becomes an individual contract." It is clear from this language that the Postal Service is not obligated to place any orders, and that the contractor is not bound unless it accepts an order. The effect of this paragraph is that the BPA itself does not create any enforceable obligations between either party. Only accepted orders would create any obligations. To the extent that an inference of an obligation arises from paragraphs 2 and 4, it is negated by the explicit language of paragraph 3. The plain language of the BPA, thus, appears to be contemplative of future contracts. There is no language indicating any present intent that either party be bound.

This construction is consonant with the rules governing BPAs set out in the Postal Service Procurement Manual. The Procurement Manual was promulgated by the Postal Service under authority granted it by the Postal Reorganization Act[3] and the Code of Federal Regulations. 39 C.F.R. §§ 601.100–601.105 (1988); *see Peoples Gas, Light & Coke Co. v. United States Postal Serv.*, 658 F.2d 1182, 1189 (7th Cir. 1981) (code provisions granting general powers to Postal Service authorize it to promulgate procurement regulations). Because of its incorporation by reference in regulations issued pursuant to statutory authority, the Manual has the force and effect of law. *See De Matteo Constr. Co.*

---

2. The court orally informed the parties that the Postal Service's motion to dismiss under RUSCC 12(b)(1) (lack of subject matter jurisdiction) would be denied. The subsequent briefs argued the appropriateness of summary judgment un-

der RUSCC 56 (no genuine issue of material fact).

3. Pub.L. No. 91–375, 84 Stat. 719 (1970) (codified at Title 39, United States Code).

v. United States, 220 Ct.Cl. 579, 591, 600 F.2d 1384, 1391 (1979) (Postal Contracting Manual, which was superseded by Procurement Manual, 39 C.F.R. § 601.102(b) (1988), has force and effect of law).

According to the Procurement Manual and its companion publication, the Procurement Handbook, a basic pricing agreement is similar to an ordering agreement, the difference being that "ordering agreements are used for large dollar amounts and basic pricing agreements are used for simplified purchases. The similarity is that they both set up terms and conditions prior to the need for supplies and services so that when the need arises, delivery time can be shortened." United States Postal Service Procurement Handbook 5.1–4 (June 1988).[4] The Procurement Manual states that "[a]n ordering agreement is not itself a contract. It is a written agreement negotiated between a purchasing activity and a contractor that contains terms and conditions applying to future contracts (orders) between the parties." United States Procurement Manual 5–10 (Oct.1987).

This view of the BPA is echoed in other federal regulations applicable to basic agreements. The Government commonly uses basic agreements, such as the BPA in this case, to facilitate procurement of various products and services. The Federal Acquisitions Regulations (FAR) System "prescribes policies and procedures for es-

tablishing and using basic agreements and basic ordering agreements." 48 C.F.R. § 16.701 (1988). Both "basic agreements" and "basic ordering agreements" contain "contract clauses applying to future contracts between the parties during [the] term [of the contract]." 48 C.F.R. §§ 16.-702(a), 16.703(a) (1988). The principal difference between the two is that a basic ordering agreement, in addition to containing the elements of a basic agreement, also describes the goods or services to be furnished, the methods by which prices are determined, and the parties authorized to issue orders to the contractor. Because the BPA in the present case contained these additional elements, it appears to be more representative of a "basic ordering agreement."

The regulations list a number of terms that a basic ordering agreement must contain.[5] The BPA in the present case appears to have been drafted so as to comply with these regulations because all of these terms are included. The applicable regulations go on to state that "[a] basic ordering agreement is not a contract," 48 C.F.R. § 16.703.3(a), and "shall not state or imply any agreement by the Government to place future contracts or orders with the contractor or be used in any manner to restrict competition." 48 C.F.R. § 16.703(c).[6]

The main treatises and hornbooks on government contracts also support the interpretation of the BPA as a mere frame-

---

**4.** The Procurement Handbook is not law itself, as the Procurement Manual is. It simply contains "[p]rocedural guidance and forms necessary to implement and supplement the [Procurement Manual]." Procurement Manual at 1–1.

**5.** According to the regulations, each basic ordering agreement shall:
  (i) Describe the method for determining prices to be paid to the contractor for the supplies or services;
  (ii) Include the delivery terms and conditions or specify how they will be determined;
  (iii) List one or more Government activities authorized to issue orders under the agreement;
  (iv) Specify a point at which each order becomes a binding contract (e.g., issuance of an order, acceptance of the order in a specified manner, or failure to reject the order within a specified number of days);

  (v) Provide that failure to reach agreement on price for any order issued before its price is established ... is a dispute under the Disputes clause included in the basic ordering agreement; and
  (vi) If fast payment procedures will apply to orders, include the special data required by [the Fast Payments Procedure section (48 C.F.R. § 13.303(b)) ].
  48 C.F.R. § 16.703(c)(1) (1988).

**6.** For a further discussion of whether a basic agreement drafted under the FAR is a binding contract, see Almar Indus., Inc. v. United States, 16 Cl.Ct. 243 (1989); see also Great Falls Terminal Warehouse Co., 68–2 B.C.A. (CCH) ¶ 7138 (A.S.B.C.A.1968) (board is without jurisdiction to hear claim for damages allegedly due to Government's failure to issue orders under basic agreement).

work for future contracts. The authors of these books note that a basic agreement does not contain any exchange of promises. Contractual obligations will arise only after an order is placed. 1 R. Nash & J. Cibinic, Federal Procurement Law 473–74 (3d ed. 1977); *see also* W.N. Keyes, Government Contracts Under the Federal Acquisition Regulations § 16.61 (1986) (basic ordering agreement "is not a contract [but] contains items and clauses applying to future contracts"); E. Massengale, Fundamentals of Federal Contract Law 77 (1991) ("The basic ordering agreement is not a contract as such."). As McBride and Touhey comment, such agreements serve the purpose of consolidating:

> into one instrument of indefinite duration those contract provisions which will be standard to every contract with a particular concern. In this way, prolonged and repeated contract negotiations are curtailed, if not eliminated, and the parties are spared the bother and expense of going over the same ground again and again. In essence, this arrangement is an agreement to agree, a set of ground rules as it were, and no obligations are assumed by either party until orders are given by the Government and accepted by the contractor. In other words, the basic agreement of itself is not a contract, and does not become a contract except to the extent that orders are issued under it.

2 J. McBride & T. Touhey, Government Contracts § 18.70 (1984). They go on to state that a "basic ordering agreement is not a contractual commitment by the Government to make any purchases." *Id.*

One commentator appears to address the issue in this case directly. Donald Gavin writes:

> This is the arrangement between the government and a contractor by which the parties agree to the terms upon which particular supplies or services will be furnished without fixing the quantity or the obligation until an order is placed. It is often referred to as [a] ... "basic agreement" or "basic ordering agreement," ....

> The great source of confusion with this arrangement has been over whether or not it is actually an enforceable contract. The courts have often held that, because of lack of consideration and mutuality, these contracts at their inception are unenforceable, and they become valid and binding only to the extent that they are performed. This concern for lack of consideration and mutuality stems from the nature of the arrangement. Usually the parties merely arrange to do business when the government places an order at the unit price named in the agreement. In such an agreement, there is nothing in writing which requires the government to take any ascertainable quantity or amount.

Gavin, *Government Requirements Contracts,* 5 Pub.Cont.L.J. 243, 246 (1972) (citations omitted). Therefore, the BPA cannot form the basis for a contractual claim.

■ MSTC asserts that the present circumstances warrant an interpretation of the BPA different from that espoused in both the regulations and the literature. MSTC advances two bases for this assertion. First, MSTC alleges that Paul Lankin, a systems analyst/programmer at the Postal Service Academy, assured MSTC "that MSTC would be receiving all of the Academy's [MAC] work except for work which his own in-house staff could perform." Twiford Supplemental Affidavit, September 24, 1991, at ¶ 2.[7] Unfortunately for MSTC, Mr. Lankin is not a contracting officer, and has no authority to bind the Postal Service. Therefore, statements made by Mr. Lankin cannot be interpreted to represent the "intent" of the Postal Ser-

---

7. The Postal Service strenuously argues that the parol evidence rule bars the consideration of Mr. Lankin's assurances because the BPA is an integrated document. The cases cited by the Postal Service to support this argument all concern contracts that are valid and enforceable. Because the Postal Service contends the BPA is

vice to enter into any contract, requirement or otherwise.[8]

■ Second, MSTC alleges that the "practical aspects" of providing MAC services to the Postal Service Academy mandate that only one contractor be employed for those services. Accordingly, MSTC argues that the BPA was necessarily a requirements contract by which the Postal Service implicitly promised to order all of its MAC work from MSTC.

In his affidavit, Scott Twiford, a director of MSTC, states that the telephone system at the Postal Academy is so complex that the system might malfunction if multiple contractors were used. From this, MSTC concludes that employment of different contractors could lead to inefficiency:

> One company could come in and program the system one way and leave no log or description of work performed. The next company called to perform work might do their work differently.... Thus, while in theory there may be no reason why the Postal Service could not have requested a dozen different contractors to perform work on the MAC portion of the telephone system, the reality of the situation is that only one contractor could effectively work on the system during a given time period.

Plaintiff's Opposition to Defendant's Motion for Summary Judgment at 11–12.

The simple answer to MSTC's contention is that, even if it made sense to use a single-source requirements contract, that does not mean that such a contract came into existence. Contracts do not spring forth whole out of needs or circumstances without the catalyst of words and actions. MSTC must show not only that the Postal Service would be wise to use only one

contractor, but that the Postal Service actually intended that the BPA serve as a requirements contract that would obligate the Postal Service to order all of its MAC work from MSTC.

A requirements contract is formed when the seller has the exclusive right and legal obligation to fill all of the buyer's needs for the goods or services described in the contract. *Mason v. United States*, 222 Ct.Cl. 436, 442, 615 F.2d 1343, 1346 (1980); *Media Press, Inc. v. United States*, 215 Ct.Cl. 985, 986 (1977); *Hemet Valley Flying Serv. v. United States*, 7 Cl.Ct. 512, 515 (1985); *Ralph Constr., Inc. v. United States*, 4 Cl.Ct. 727, 731 (1984). Thus, an essential element of a requirements contract is the promise by the buyer to purchase the subject matter of the contract exclusively from the seller. *Propane Indus., Inc. v. General Motors Corp.*, 429 F.Supp. 214, 219 (W.D.Mo.1977).

The Postal Service Procurement Manual deals directly with requirements contracts. The Manual lists certain specific clauses that each Postal Service requirements contract must contain. These clauses, when included in a contract, manifest an intention on the part of the Postal Service to obtain all of its requirements from the supplier. It is not disputed that the BPA in the present case contains none of the clauses required by the Procurement Manual for a valid requirements contract.[9]

Plainly, the BPA in the present case contains no express indication of the Postal Service's intention to look exclusively to MSTC for its MAC needs. Instead, MSTC asks this court to infer that intent from assurances made by a Postal Service employee who lacked contracting authority, and from the imprudence of employing multiple MAC contractors. We decline to

---

not enforceable, the court chooses not to rely on the parol evidence rule.

**8.** Included with Scott Twiford's supplemental affidavit was the affidavit of Richard Twiford, MSTC's vice president of finance and operations. Defendant has moved to strike Richard Twiford's affidavit as being outside of the scope of this court's order allowing the filing of Scott Twiford's supplemental affidavit. Because

Richard Twiford's assertions do not advance MSTC's case, the motion to strike is denied as moot.

**9.** The clauses required by the Postal Service Procurement Manual for requirements contracts are Clause 5–12, Ordering; Clause 5–12, Delivery Order Limitations; and Clause 5–15, Requirements. Procurement Manual § 5.1.5.f.

draw such an inference. Our unwillingness to go along with MSTC's argument stems from the second issue of contract construction raised by this case: whether the BPA is sufficiently definite to allow the court to determine breach and/or remedies.

*Torncello v. United States*, 231 Ct.Cl. 20, 681 F.2d 756 (1982), which MSTC identifies as "the leading case on the issue of the interpretation of requirements contracts and indefinite quantities contracts,"[10] expounds the rule of law that is fatal to MSTC's cause of action:

> [I]t is the very essence of a requirements contract ... that the buyer agree to turn to the supplier for *all* of its needs. If there is not a commitment for all needs, then the relation is not different from an indefinite quantities contract with no required minimum, the very type of relation that the Supreme Court held in *Willard, Sutherland & Co. [v. United States*, 262 U.S. 489, 43 S.Ct. 592, 67 L.Ed. 1086 (1923) ], could not be a contract.

*Torncello*, 681 F.2d at 768–69 (emphasis in original). By its own interpretation of paragraph 3 of the BPA, MSTC concedes that that paragraph essentially provides that the Postal Service "is not obligating itself to pay for a definite quantity, such as one MAC call per month, whether needed or not, or for a minimum quantity, such as two MAC calls per year, whether needed or not." Plaintiff's Opposition to Defendant's Motion for Summary Judgment at 14. By MSTC's concession, the BPA is nothing more than an "indefinite quantities contract with no required minimum," a document described as unenforceable by the *Torncello* court.

The BPA contains no minimum quantity provision. There is nothing in the document that requires that the Postal Service order *any* MAC work from MSTC, even if the need for MAC work does arise. MSTC admits that certain MAC work was to be performed in-house by Postal Service em-ployees. From the record, it appears that if a particular change to the system is not very complicated, the Postal Service can elect to perform the service itself.

We were confronted with a similar issue in *Ralph Constr., Inc. v. United States*, 4 Cl.Ct. 727 (1984). In *Ralph*, the court held that a contract that allowed the Government to assign work in-house was not a requirements contract because the Government was not obligated to assign work exclusively to the plaintiff. *Ralph*, 4 Cl.Ct. at 731. The contract provided, "This is a requirements contract ...," and the parties stipulated that the contract was a requirements contract. *Id.* The court, however, rejected that interpretation and held instead that the agreement was unenforceable because the Government was not obligated to turn to the contractor for all of its needs. *Id.*

The BPA in the present case bears even less resemblance to a requirements contract than did the document in *Ralph*. Nowhere in the BPA does the Postal Service promise to order any of its MAC requirements from MSTC, much less all of its requirements. Because the Postal Service has the discretion to perform certain MAC work in-house, it is impossible to ascertain a definite amount of work that should be assigned to MSTC, if any. Without a minimum quantity provision, the BPA does not provide the court any guidance as to how to determine if and when a breach has occurred. Therefore, the BPA does not rise to the level of a binding contract and must fail for indefiniteness.

## CONCLUSION

The absence of mutuality of obligation leads to the conclusion that the parties lacked the requisite contractual intent. Additionally, the BPA is not sufficiently definite for this court to find that the Postal Service was in breach by not ordering its MAC work through MSTC.[11] Because

---

**10.** Plaintiff's Opposition to Defendant's Motion for Summary Judgment at 5, n. 4.

**11.** In its brief opposing the motion for summary judgment, MSTC raises for the first time the claim that the Postal Service was acting in bad faith when it failed to order any MAC work from MSTC. According to MSTC's argument, the Postal Service was punishing MSTC for MSTC's refusal to agree to the termination of

there exists no genuine issue of material fact, defendant's motion for summary judgment is granted. The Clerk is directed to dismiss the complaint. No costs.

/s/ <u>Eric G. Bruggink</u>
ERIC G. BRUGGINK
Judge

the prior FSM contract between the parties. Because the court holds that there is no contract for the Postal Service to breach, the bad faith allegations, even if true, are irrelevant to this case.