Faye **ZHENGXING,** Plaintiff,

v.

The **UNITED STATES,** Defendant.

Nos. 04–0119C, 05–532C.

United States Court of Federal Claims.

June 9, 2006.

Faye Zhengxing, 89–20 55th Avenue, Elmhurst, New York, Pro Se.

Andrew P. Averbach, U.S. Department of Justice, Civil Division, Commercial Litigation Branch, 1100 L Street, NW, 12th Floor, Washington, DC, for Defendant.

## MEMORANDUM OPINION AND ORDER OF DISMISSAL

WILLIAMS, Judge.

Plaintiff, *pro se*, filed two actions in this Court seeking compensation for the unlawful termination of her blanket purchase agreement (BPA) with the Voice of America (VOA). Plaintiff also raised a myriad of other claims, including Title VII violations, sexual harassment, trespass, theft, invasion of privacy, and breach of contract. Plaintiff seeks damages in excess of $8.9 million.[1] This is not the first time Plaintiff has sought redress for alleged wrongs stemming from her brief tenure as a Purchase Order Vendor (POV) at VOA. Plaintiff filed a Title VII action in the District Court which was dismissed because she was not an "employee" covered by that statute, and she appealed to the United States Court of Appeals for the District of Columbia Circuit which affirmed the District Court.[2] Plaintiff unsuccessfully sought a rehearing en banc, petitioned the Supreme Court for a writ of certiorari, and sought a rehearing at the Supreme Court when her writ of certiorari was denied.

This matter comes before the Court on Defendant's motion to dismiss for lack of

---

1. These actions, Nos. 04–0119C and 05–532C, were consolidated. Plaintiff filed a motion for immediate relief, as well as two additional motions for special damages bringing the total claimed to $100 million.

2. In the Title VII suit, Ms. Zhengxing sued the Chairman of the United States Broadcasting Board of Governors in his official capacity asserting claims for employment discrimination and wrongful termination. *Zhengxing*, 215 F.Supp.2d 114, 120 (D.D.C.2002), *aff'd, Zhengxing v. Tomlinson*, No. 02–5267, 2002 WL 31926829 (D.C.Cir. Dec. 31, 2002), *reh'g denied*, (Mar. 14, 2003), *reh'g and reh'g en banc denied*, (Mar. 14, 2003), *cert. denied, Zhengxing v. Tomlinson*, 539 U.S. 965, 123 S.Ct. 2656, 156 L.Ed.2d 668 (2003), reh'g *denied*, 539 U.S. 984, 124 S.Ct. 40, 156 L.Ed.2d 698 (2003).

subject matter jurisdiction or, in the alternative, for failure to state a claim upon which relief can be granted. Because Plaintiff has failed to allege any claim over which this Court has jurisdiction, Defendant's motion is granted, and the action is dismissed.

### Background [3]

In May 2000, Plaintiff interviewed for a job with VOA. Compl. at 4. Mr. William Baum, Chief of the Chinese Branch, offered Plaintiff a position with VOA as a POV with its Mandarin Service, a subdivision of its Chinese Branch. *Id.*[4] The job entailed " 'broadcast related duties' such as announcing, translating news and features, and producing." *Zhengxing v. Nathanson,* 215 F.Supp.2d 114, 115 (D.D.C.2002).[5] Plaintiff declined the offer, citing her tenure-track position at Lynchburg College and the higher cost of living in Washington, DC. Compl. at 4. The following day, Plaintiff received a phone call from Mr. Jing Zhang, then a Senior Editor in the Mandarin Service, and he promised her a television host position and assured her that she would not make less than her Lynchburg College salary. Compl. at 5. Shortly thereafter, Plaintiff received a "Questionnaire for Public Trust Positions," which she interpreted as an indication of VOA's "great need for her services." *Id.*[6]

On July 24, 2000, Plaintiff began working at VOA, believing she would be hired for a television host position.[7] However, Plaintiff began work as a POV in a position of "information assistant" and was assigned the responsibility of editing and translating news highlights. Plaintiff did not protest and "did the work as instructed, waiting for the TV host job." Compl. at 5. In September 2000, a television host position was advertised in an e-mail. Plaintiff applied and auditioned, but she did not receive the position. Compl. at 6–7. Afterwards, Mr. Baum informed Plaintiff that three more television host positions would be "coming soon." Compl. at 7.

During her time at VOA, Plaintiff had begun to feel uncomfortable around Mr. Baum, believing that "he made eyes at her," purposefully "walk[ed] around her many times during work hours though he did not supervise her directly" and "[met] her in the hallway when she came in to work." Compl. at 5–6. In October 2000, Plaintiff believed her suspicions confirmed when she placed a personal advertisement online and received a response from someone named "Bill" with the initials "WB." Compl. at 7.[8] The response read:

> "I will start with the reality that nothing is as presented in all aspects ... I'm simply hoping your (sic) safe & sane (I believe you are & just have a unique ad; got to me!). I did like your approach (I'm guessing most men won't ... I'm not most men). Well I'm 52 & still have an ad on Yahoo (search bluemoonpassport). I'm not a bold man; just understanding, caring, still excited by a loving woman's touch and so on check me out & I hope to hear from you at my MSN email address. Sweet dreams [9] (dreams do come true) ... Bill"

Compl., Att. 8. Believing her online suitor to be Mr. Baum, she responded negatively. Compl. at 8 (ellipsis in original).

---

**3.** This background contains Plaintiff's allegations and is derived from Plaintiff's Claim No. 04–0119C. To prevent confusion between Plaintiff's claims in this Court and her August 5, 2003 claim submitted to Voice of America's contracting officer, the claims filed in this Court will be denominated complaints.

**4.** POVs perform individual assignments as needed on a day-to-day basis and are paid a set amount per order or assignment. Declaration of William Baum dated May 24, 2002, (Baum Decl.), Compl. Att., 10 at ¶ 3.

**5.** VOA is part of the International Broadcasting Bureau of the United States Broadcasting Board of Governors, an independent federal agency responsible for government-sponsored, non-military international broadcasting.

**6.** The Questionnaire for Public Trust Positions is used by the United States Office of Personnel Management to examine the suitability of individuals for federal employment pursuant to 5 C.F.R. §§ 731, 732, 736.

**7.** It is unclear from Plaintiff's filings whether the television host position was another POV position or a full-time position.

**8.** Plaintiff's personal ad is not in the record.

**9.** Plaintiff contends that the sweet dream referred to the television host position she was promised.

After resisting what she thought to be Mr. Baum's "sexual advance," Plaintiff did not receive any of the three television host positions. On March 14, 2001, Plaintiff was assigned to a web team collecting e-mail addresses. Compl. at 8; Baum Decl.¶ 10; Compl., Att. 10 ¶ 10.[10] Plaintiff believed her inability to secure a television host position and her demotion were the result of rejecting Mr. Baum's sexual advances. On April 13, 2001, Plaintiff filed an informal complaint with the International Broadcasting Board's Equal Employment Office, and when that did not succeed, she filed a formal administrative complaint on May 18, 2001, alleging that William Baum had sexually harassed her. Compl. at 8; Pl. Compl. Att. 14, 33.[11] The Equal Employment Office dismissed Plaintiff's complaint finding Plaintiff's claims without merit. *See* Compl., Att. 20.

Meanwhile, in January 2001, VOA offered Plaintiff a blanket purchase agreement (BPA). Compl. Atts. 2, 3.[12] Plaintiff refused to sign the BPA, "because she did not agree with the timing when this contract was offered, nor could she accept the position and salary that would downgrade her career." Compl. at 16.[13] Plaintiff, however, performed services under purchase orders issued under the BPA, "submit[ted] monthly invoices ... placed under the BPA [and] ... accepted all payments issued under th[e] BPA." Compl., Att. 3. Plaintiff also received an increase in her pay from $60 to $65 per order. Compl., Att. 10 ¶ 11.

Ultimately, VOA informed Plaintiff by letter from the Acting Program Director, on August 16, 2001, that her "contractual relationship with the Chinese Branch" was terminated for "misconduct [that] included false or malicious statements and disrespectful conduct toward coworkers and the Chinese Branch Chief." Compl., Att. 21. The letter stated in pertinent part:

Re: Purchase Order Contract No. BPA 122–0021 [14]

[Y]ou alleged that there was a relationship between the Branch Chief and another POV ... the POV was paid for days she did no work, that the POV received more money per assignment than the rate paid to you, ... that the POV was absent from the office at similar times as the Branch Chief ... that the Branch Chief responded twice to personal ads you posted on a website ... that the POV assignment editor promised you a TV host position when you began to work with the Chinese Branch; and that a coworker told you that you 'found a new job' when your assignment had been changed as a means to 'psychologically harass' you.

The Agency took your allegations of this nature very seriously and immediately investigated them. Upon investigation, VOA Chief of Staff Michael Zeitlin found that all of your claims were either patently false or totally unsupported by any factual evidence.... Despite this you continued to make false or unsupported allegations.... [Y]ou filed a report with the Metropolitan police in which you alleged ... that e-mails relating specifically to your claims against your supervisor were missing from your apartment....

Your conduct impugns the Branch Chief and your co-workers and is disrespectful. Your untruthful and malicious allegations ... harm the reputation of the Branch

---

**10.** In the District Court action, Plaintiff stated that her assignments changed on March 9, 2001, from editing and translating to "downloading the audience's e-mail addresses." *Zhengxing*, 215 F.Supp.2d at 115–16.

**11.** The District Court opinion calls the EEO office the EEOC, stating that "[Plaintiff] filed an informal complaint with the Equal Employment Opportunity Commission ('EEOC') on April 13, 2001 and a formal administrative complaint on May 18, 2001." 215 F.Supp.2d at 116.

**12.** A BPA is "a simplified method of filling anticipated repetitive needs for supplies or services by establishing 'charge accounts' with qualified sources of supply." 48 C.F.R. § 13.303–1. BPAs obligate the Government only to the extent of authorized purchases actually made under the BPA. 48 C.F.R. § 13.303–3(a)(2).

**13.** Plaintiff states that the BPA was offered in May 2001. Compl. at 27. However, the documents in the record uniformly state that the BPA was offered in January 2001. Compl., Att. 2 (BPA Agreement), 3 (Contracting Officer's final decision), 10 (Baum Decl. ¶ 11).

**14.** This is the same BPA number that Plaintiff was offered in January 2001. Compl., Att. 2.

Chief, which undermines his supervisory authority. *Id.*

Plaintiff filed an action in the United States District Court for the District of Columbia alleging sexual harassment, seeking damages for back pay and for emotional distress and attorney's fees under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq. Zhengxing*, 215 F.Supp.2d at 115. The District Court dismissed Plaintiff's complaint for lack of jurisdiction after concluding that she was not an employee covered by Title VII. Plaintiff appealed to the United States Court of Appeals for the District of Columbia, which affirmed the District Court's dismissal. Plaintiff then filed a petition for rehearing *en banc*, which was denied in a *per curiam* order dated March 14, 2003. Finally, Plaintiff filed a petition for certiorari in the United States Supreme Court, which was denied on June 27, 2003, *Faye Zhengxing v. Tomlinson*, 02–10717, as was her petition for rehearing before the United States Supreme Court on August 25, 2003.

On August 5, 2003, Plaintiff filed a claim with a VOA contracting officer challenging the termination of her BPA. Compl., Att. 3. By letter dated August 28, 2003, the VOA contracting officer denied Plaintiff's claim, stating: "Under Federal law, a blanket purchase agreement is not a contract, and the government is only obligated to the extent of the purchases actually made under the BPA." *Id.* The contracting officer also noted that "a contractor does not have any entitlement to future contracts" and that all invoices for the purchase orders that Plaintiff performed were "paid in full with zero balance." *Id.* (citations omitted).

Plaintiff filed an action in this Court on January 29, 2004, appealing the contracting officer's final decision under the CDA, 41 U.S.C. § 601 (2000) et. *seq.* In addition to Plaintiff's CDA claim, she asserted a myriad of other allegations by "nameless government agents"[15] beginning in January 2000 including: ongoing criminal and tortious actions, trespass, theft, privacy violations, brib-

ery, property damage, death threats, and poisoning. Among other things, Plaintiff alleged:

- A 'killing project by continuously poisoning the food and drinks Plaintiff tended to buy at nearby stores,' including cooking oil, ice cream, yogurt and oatmeal. Pl. Mot. for More Special Damages (Pl.Mot.) at 2.

- That Defendant poisoned water she drank while visiting her daughter in New York City through advance notice of her plans to travel through tapping her phone, which allowed the Defendant to "put the poison in the filter of the pitcher in advance." Pl. Mot. at 3.

- That Defendant has poisoned her family as her father was diagnosed with lung cancer as a result of being poisoned. Pl. Mot. for Immediate Relief and Change of Address at 1.

- That Defendant concealed and stole blood test results and withheld medical records from her and her primary care physician. Pl. Second Mot. For More Special Damages (Pl.Sec.Mot.) at 2, 4.

In her most recent Complaint, 05–532C (Sec.Compl.) Plaintiff raised fourteen claims: legal fraud (falsifying a Supreme Court ruling), attempted murder, mail theft, bribery, document fraud, illegal search and seizure, property damage, illegal surveillance, threats on her life, hit-and-run, vehicle plate theft, medical records fraud, medical benefit deprivation, and ordering police not to protect her. Specific allegations included: an April 2001 break-in of her home in which "Defendant" stole e-mails and an electronic organizer in order to steal evidence related to this case; property destruction in May 2002 to her car, resulting in a smashed window and cuts on the ceiling of the car; unreasonable difficulty in renewing Plaintiff's medical insurance in November 2004, which was "definitely part of Defendant's conspiracy to cover up its crimes and to inflict permanent injury on Plaintiff if it had failed to kill her;" deprivation of her medical benefits during a November 22, 2004

---

**15.** Plaintiff asserts throughout her filings that "Defendant" perpetrated the alleged conduct. This appears to be an allegation against the United States Government at large as Plaintiff does not name any specific actors.

visit to Southwest Health Center when her physical examination was not properly conducted; falsification of her medical records by deleting white and red blood cell counts from a January 1, 2005 medical test and canceling other test results; conspiracy by Defendant in a hit-and-run accident on January 3, 2005; and theft of her license plates on January 13, 2005. Sec. Compl. at 6–8, 20, 23, 24–25, 56.[16]

### Discussion

Subject matter jurisdiction may be challenged at any time by the parties, the Court sua *sponte* and even on appeal. *Booth v. United States,* 990 F.2d 617, 620 (Fed.Cir. 1993). In ruling on a motion to dismiss for lack of subject matter jurisdiction, the Court must presume all undisputed factual allegations to be true and construe all reasonable inferences in favor of the plaintiff. *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *Cedars–Sinai Med. Ctr. v. Watkins,* 11 F.3d 1573, 1583 (Fed.Cir. 1993). However, when considering a motion to dismiss for lack of subject matter jurisdiction, the Court can examine any relevant evidence in determining predicate jurisdictional facts. *Moyer v. United States,* 190 F.3d 1314, 1318 (Fed.Cir.1999); *Reynolds v. Army and Air Force Exchange Service,* 846 F.2d 746, 747 (Fed.Cir.1988). Ultimately, however, the plaintiff bears the burden of establishing jurisdiction by a preponderance of the evidence. *Taylor v. United States,* 303 F.3d 1357, 1359 (Fed.Cir.2002).

The Court recognizes that Plaintiff is a *pro se* litigant. In such instances, the Court does not hold Plaintiff's pleadings to the more stringent standards that would apply if Plaintiff were represented by counsel. *See Hughes v. Rowe,* 449 U.S. 5, 9, 101 S.Ct. 173, 66 L.Ed.2d 163 (1980). The fact that Plaintiff is proceeding *pro* se, however, "does not excuse [a complaint's] failures, if such there

be." *Henke v. United States,* 60 F.3d 795, 799 (Fed.Cir.1995).

The Tucker Act both confers jurisdiction upon the United States Court of Federal Claims (COFC) and waives sovereign immunity with respect to certain actions for monetary relief brought against the United States. *See United States v. Mitchell,* 463 U.S. 206, 212–18, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983); *see also Fisher v. United States,* 402 F.3d 1167, 1172 (Fed.Cir.2005) (en banc). Under the Tucker Act, sovereign immunity is waived for "any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1) (2000).

However, the Tucker Act does not, by itself, "create any substantive right enforceable against the United States for money damages." *United States v. White Mountain Apache Tribe,* 537 U.S. 465, 472–73, 123 S.Ct. 1126, 155 L.Ed.2d 40 (2003); *see also Fisher,* 402 F.3d at 1172 ("[A] plaintiff must identify a separate source of substantive law that creates the right to money damages," *i.e.,* a source which is "money mandating").

### Contract Claims

Plaintiff filed this action pursuant to Section 609(a)(1) of the CDA appealing the contracting officer's final decision. Plaintiff also alleges the breach of an implied oral contract. The CDA waives sovereign immunity and expressly authorizes this Court to review final decisions of a contracting officer. 41 U.S.C. § 609. The Court's jurisdiction under the CDA requires the existence of an express or implied contract between the appellant and the Government. The CDA only applies to "any express or implied contract ... entered into by an executive agency." 41 U.S.C. § 601 (2000).[17]

---

16. According to Plaintiff, the electronic organizer was stolen from Plaintiff's home in 2002, but "[a]fter three years, it was put back under the passenger's seat in Plaintiff's car." Sec. Compl. at 6, n. 2.

17. Further, only a contractor, *i.e.,* a "party to a Government contract other than the Govern-

ment," may appeal a contracting officer's decision. 41 U.S.C. § 601(4); *see also United States v. Johnson Controls, Inc.,* 713 F.2d 1541, 1550–51 (Fed.Cir.1983) (recognizing that because subcontractor was not a "contractor" as defined in the CDA, there was no CDA jurisdiction to consider its direct appeal).

■ The general requirements for a binding contract with the United States are identical for both express and implied contracts. *Trauma Serv. Group v. United States*, 104 F.3d 1321, 1325 (Fed.Cir.1997). When contracting with the Federal Government, those elements of contract formation are: "(1) mutuality of intent to contract; (2) lack of ambiguity in offer and acceptance; (3) consideration; and (4) a government representative having actual authority to bind the United States in contract." *Anderson v. United States*, 344 F.3d 1343, 1353 (Fed.Cir.2003); *Total Medical Mgmt., Inc. v. United States*, 104 F.3d 1314 (Fed.Cir.1997).[18]

■ Plaintiff alleges that Defendant breached a written contract, the BPA, by depriving her of Title VII protection, firing her in retaliation for her discrimination complaints, firing her prior to the BPA term's end, and not paying her sufficient compensation. However, BPAs themselves are not contracts. Rather, BPAs are "a simplified method of filling anticipated repetitive needs for supplies or services by establishing 'charge accounts' with qualified sources of supply." 48 C.F.R. § 13.303–1(a). In *Modern Systems Technology Corporation v.*

United States, 24 Cl.Ct. 360, 362 (1991), *aff'd*, 979 F.2d 200, 202–04 (Fed.Cir.1992), this Court held that an analogous Basic Pricing Agreement did not create a contractual obligation because the BPA at issue stated that the agency was obligated "only to the extent of individual authorized orders actually placed under this agreement." *Id.*[19] Therefore, "only accepted orders would create an contractual obligation." *Id.*[20] Similarly, in this case, Plaintiff's BPA states that "[t]he Agency shall be obligated only to the extent of authorized call orders actually placed under this agreement." Compl., Att. 2. As such, Plaintiff's BPA lacks the mutual intent required to form a binding contract.[21]

Because Plaintiff's BPA was not a contract, there is no factual or legal predicate establishing jurisdiction under the CDA. As the Armed Services Board of Contract Appeals recognized in *Julian Freeman*, No. 46675, 94–3 BCA at 135,906, the Board lacked jurisdiction over a claim involving a BPA because "a BPA is not considered to be a contract because it lacks mutuality of consideration." Id. at 135,907 (citations omitted).[22] In sum, the CDA does not confer

18. "The Supreme Court has defined an implied-in-fact contract as 'an agreement ... founded upon a meeting of minds, which, although not embodied in an express contract, is inferred, as a fact, from conduct of the parties showing, in the light of the surrounding circumstances, their tacit understanding.' " *Barrett Refining Corp. v. United States*, 242 F.3d 1055, 1059–60 (Fed.Cir. 2001) (citing *Balt. & Ohio R.R. v. United States*, 261 U.S. 592, 597, 58 Ct.Cl. 709, 43 S.Ct. 425, 67 L.Ed. 816 (1923); *Cities Serv. Gas Co. v. United States*, 205 Ct.Cl. 16, 500 F.2d 448 (1974)).

19. Plaintiff argues that *Modern Systems Technology* is distinguishable because the agreement in that case was referred to as a Basic Pricing Agreement rather than a Blanket Purchase Agreement. Compl. at 25. However, the Basic Pricing Agreement in *Modern Systems Technology* and the Blanket Purchase Agreement here have the same legal import for the issue sub judice in that neither instrument itself is a contract. As called for by 48 C.F.R. § 13.303–3, both BPAs contain a "statement that the Government is obligated only to the extent of authorized purchases actually made under the BPA." 48 C.F.R. § 13.303–3(a)(4).

20. Boards of Contract Appeals have also held that BPAs are not contracts. *See, e.g., Prod. Packaging*, ASBCA No. 53662, 03–2 BCA ¶32,-388 (ASBCA 2003) ("It is well established that a

BPA is not a contract. Rather, a BPA is nothing more than an agreement of terms by which the Government could purchase."); *Potomac Computers Unlimited, Inc.*, DOT CAB No. 2603, 94–1 BCA ¶26,304, 1993 WL 343203; *Mid–America Officials Ass'n*, ASBCA No. 38678, 89–3 BCA ¶22,231, 1989 WL 109769.

21. The umbrella BPA is to be distinguished from an individual purchase order—which can give rise to a contract. "A purchase order ... is an offer by the government to the supplier to buy certain supplies or services upon specified conditions. A contract is established when the supplier accepts the order, by furnishing the supplies or services ordered or by proceeding with the work to the point of substantial performance prior to the due date." *Friedman Enterprises*, ASBCA No. 54886, 05–2 BCA ¶32,991, 2005 WL 1385135. In this case, however, Plaintiff does not challenge the termination of an outstanding Purchase Order; she challenges the termination of the BPA.

22. The CDA provides the Court of Federal Claims and the Boards of Contract Appeals coextensive jurisdiction as follows: "[I]n lieu of appealing the decision of a contracting officer under section 605 of this title to an agency board, a contractor may bring an action directly on the

jurisdiction on this Court because the BPA is not an express contract. Nor is there an implied-in-fact contract obligating the Government to continue issuing POs to Plaintiff. Rather, here as in *Julian Freeman,* the BPA "unambiguously limit[ed] the Government's obligation to purchases actually made." 94–3 BCA at 135,907.

 Plaintiff further asserts that Defendant breached an implied oral contract to provide her with a television host position. To the extent that Plaintiff claims Mr. Jing's promise of the television host position was a promise for a full-time employment contract, such claim fails as a matter of law. "Absent specific legislation, federal employees derive the benefits and emoluments of their positions from appointment rather than from any contractual or quasi-contractual relationships with the government." *Chu v. United States,* 773 F.2d 1226, 1229 (Fed.Cir.1985) (citations omitted); *see also Collier v. United States,* 379 F.3d 1330, 1331 (Fed.Cir.2004) ("Civil Service employees hold their positions by appointment, not contract.").

To the extent Plaintiff claims that the television host position should have been issued to her as a POV position covered by the BPA, that claim would also fail because the Government only obligates itself to the extent of actual purchase orders issued and performed. *See Freeman,* 94–3 BCA at 135,-907 (holding that when contractor seeks payment for services never ordered under a BPA, "the Government has no obligation to appellant and no contract exists under which appellant can pursue his claim").

*Criminal Accusations and Tort Claims*

Plaintiff's consolidated complaints and motions for special damages allege several crimes and tortious activities. Plaintiff claims that "Defendant" has attempted to poison her and her family, has conducted illegal surveillance on her, has broken into her home and stolen evidence, and has been involved in a conspiracy hit-and-run. The United States Court of Federal Claims has

claim in the United States Court of Federal Claims." 41 U.S.C. § 609 (Supp.2005).

"no jurisdiction to adjudicate any claims whatsoever under the federal criminal code." *Joshua v. United States,* 17 F.3d 378, 379 (Fed.Cir.1994). The Court also does not have jurisdiction to hear claims against the United States for damages arising in tort. 28 U.S.C. § 1491(a)(1) (2000); *see also Brown v. United States,* 105 F.3d 621, 623 (Fed.Cir.1997) (dismissing claim grounded upon fraud); *Pratt v. United States,* 50 Fed. Cl. 469, 482 (2001) ("The court lacks jurisdiction to award plaintiff's prayer for damages for emotional distress."); *Cottrell v. United States,* 42 Fed.Cl. 144, 148 (1998) ("The court does not have jurisdiction over claims that defendant engaged in negligent, fraudulent, or other wrongful conduct when discharging its official duties ... harassment claims ... breach of duty claims ... tortious interference with contractual relationships ... [or] claim[s] ... framed under non-tort law ... if the essence of the claim lies in tort.") (citations omitted).

*Title VII Claims*

This Court does not have jurisdiction to entertain Plaintiff's discrimination and retaliation claims under Title VII. *Daniels v. United States,* 59 Fed.Cl. 506, 506 (2004) (dismissing the plaintiff's claim for alleged discrimination under the Civil Rights Act because this Court has no authority to "hear, decide, or grant relief" for such complaints); *Taylor v. United States,* 54 Fed.Cl. 423, 425 (2002) (reaffirming the Court of Federal Claims' lack of jurisdiction over Title VII claims because of the preemptive effect of the comprehensive scheme created by Congress). Therefore, Plaintiff's Title VII claims are dismissed.[23]

***Conclusion***

The Clerk is directed to dismiss this action for lack of subject matter jurisdiction.

**23.** Moreover, the District Court decision would preclude this claim in any event as that Court squarely held that Plaintiff was not an employee covered by Title VII.