ICP NORTHWEST, LLC, Plaintiff,

v.

The UNITED STATES, Defendant.

No. 10–869C.

United States Court of Federal Claims.

Filed under Seal: March 23, 2011.

Reissued for Publication: March 28, 2011.*

* This opinion was originally filed under seal on March 23, 2011, pursuant to this Court's January 7, 2011 protective order, and the parties were given an opportunity to advise the Court what, if any, redactions they believed were necessary before public issuance. On March 28, 2011, the parties jointly informed the Court that no redactions were required (docket entry 36). Accord-

ingly, the Opinion and Order is released in its entirety.

Cyrus E. Phillips IV, Albo & Oblon, L.L.P., Arlington, Virginia, for plaintiff.

Renee A. Gerber, Trial Attorney, Kenneth M. Dintzer, Assistant Director, Jeanne E. Davidson, Director, Commercial Litigation Branch, Tony West, Assistant Attorney General, Civil Division, United States Department of Justice, Washington D.C., for defendant. Azine Farzami, Attorney–Advisor, United States Department of Agriculture, Washington D.C., of counsel.

### OPINION AND ORDER

GEORGE W. MILLER, Judge.

## I. Background

Plaintiff brought this pre-award bid protest challenging seven United States Forest Service solicitations: five for Clerical Support Units ("CSUs"),[1] one for Geographic

---

1. The five CSU solicitations at issue are: Solicitation Number AG–0343–S–11–7000 (Region 1); Solicitation Number AG–84M8–S–11–7004 (Regions 2 and 4); Solicitation Number AG–8371–S–11–7000 (Region 3); Solicitation Number AG–9J61–S–11–7002 (Region 5), and AG–04H1–S–11–7002 (Region 6). Administrative Record at Tabs 12, 15, 23, 29, and 35, respectively (docket entry 13, Jan. 7, 2011) ("AR").

Information Systems Units ("GISUs"),[2] and one for Communications Trailers (collectively, "units").[3] Compl. at ¶¶ 1–2 (docket entry 1, Dec. 17, 2010). The units will be used to assist in fire suppression and other hazardous incidents at local, regional, and national levels. AR 44 (§ D.1).[4] CSUs provide onsite office services including copying and basic word processing, along with personnel to operate the equipment. *Id.* GISUs provide computer workstations, large-format plotters, photo-editing software, and a white board. AR 822–23 (§ D.2). The vendors may also provide a specialist to operate the GIS equipment. AR 825–26 (§ D.3). Communication Trailers house VHF and UHF base stations radios, antennas, telephone/Internet service access equipment, and a local area network system. AR 892–95 (§ D.2).

The solicitations seek firm fixed-price quotations that will result in Preseason Incident Blanket Purchase Agreements ("BPAs") against which orders for specific units will be issued. AR 34 (§ B); AR 44 (§ D.1). The BPAs will be effective for three years. AR 41 (§ C.3.1). Each order is limited in amount to $150,000, but the Forest Service estimates that over the three-year period, each agreement could result in multiple orders for services totaling between $1 million and $3 million.[5] AR 11.

### A. Orders Placed Pursuant to the BPAs
#### 1. Formation of BPAs

Pursuant to the solicitations, awards are made to all bidders offering resources that meet the specifications of the solicitations at a reasonable price. AR 35(§ B). Technical acceptability is determined on a pass/fail basis, with all those offering resources that meet the solicitations' minimum requirements receiving a pass rating. AR 62–63 (§ E.2). The Forest Service will also determine the reasonableness of the price in accordance with the FAR. *Id.* at 63. The Government anticipates awarding multiple agreements because all bidders that offer reasonably priced and technically acceptable quotes will be offered an agreement. *Id.* at 62.

#### 2. Creation of Dispatch Priority Lists

Once the BPAs are awarded, the Forest Service Contracting Officers ("COs") will create Dispatch Priority Lists from which orders for the units will be issued on a lowest-price basis. AR 49 (§ D.6.2). Awardees may propose units be dedicated to multiple particular Host Dispatch Zones ("HDZs")[6] or Geographic Area Coordination Centers ("GACCs"). AR 35(§ B). But once an award is made, the units may only be dispatched from one specific location and must be dedicated by an Awardee to only one particular [HDZ] or [GACC]. *Id.* Within ten days of an award, Awardees are responsible for providing and maintaining a current availability status to the HDZ or GACC. AR 42 (§ C.3.2); AR 48 (§ D.5).

When creating Dispatch Priority Lists, priority will first go to any entities qualifying for set-asides as provided in Section B of the solicitations, and these entities will be ranked by lowest price.[7] *Id.* at 48 (§ D.6.2). Be-

---

**2.** The GISU solicitation at issue is Solicitation Number AG–024B–S–11–7001. AR Tab 42.

**3.** The Communications Trailer solicitation at issue is Solicitation Number AG–024B–S–11–7002. AR Tab 50.

**4.** For clarity, the Court will cite to the template on which the solicitations are based, AR Tab 8, because the template terms appear in all seven solicitations. If, however, a specific solicitation is at issue, the Court will then cite to that solicitation.

**5.** In view of the $150,000 limit on orders, the Forest Service was entitled to and did proceed in accordance with simplified acquisition procedures. *See* 41 U.S.C. § 427(a)(1); 48 C.F.R. § 2.101 (2010) (simplified acquisition threshold means $150,000); Federal Acquisition Regula-

tion ("FAR") Part 13 (regulations pertaining to simplified acquisition procedures).

**6.** The solicitations define HDZs as the "[g]eographic area defined by the Host Dispatch Center's area of authority." AR 199 (Ex. A). Host Dispatch Centers are interagency dispatch centers that are responsible for dispatching resources pursuant to the BPAs. *Id.*

**7.** The solicitations provide that BPAs will first be offered to HUBZone small business concerns and Service Disabled Veteran Owned Small Business ("SDVOSB") concerns. AR 35(§ B). If not enough offers are received from either HUBZone or SDVOSB concerns, additional awards will be made to small businesses. *Id.* Similarly, orders issued pursuant to the BPAs will first go to HUBZone and SDVOSB concerns, with priority

cause the Government cannot determine when forest fires and other incidents may occur, each solicitation includes the following clause:

> PRICING AND ESTIMATED QUANTITY
>
> . . .
>
> Since the needs of the Government and availability of Contractor's resources during an emergency cannot be determined in advance, it is mutually agreed that, upon request of the Government, the Contractor shall furnish the resources listed herein to the extent the Contractor is willing and able at the time of the order. Due to the sporadic occurrence of Incident activity, the placement of any orders IS NOT GUARANTEED.

AR 34(§ B). The clauses governing the duration of the agreement also state that the Awardees are obligated to provide resources in response to orders only to the extent they are willing and able to do so. AR 42 (§ C.3.1).

### 3. *Responding to Forest Fires or Other Incidents*

During the initial response to a fire or other incident, referred to as the "initial attack," the solicitations provide that a "closest forces" concept will be utilized, meaning locally available resources may be used in lieu of Awardee resources available under the BPAs. AR 48 (§ D.6.1). All of the challenged solicitations provide, "This Agreement does not preclude the Government from using any Agency or Agency Cooperator owned resources before equipment is mobilized under this Agreement." AR 48 (§ D.6). The solicitations define Agency Cooperators as "[l]ocal Government entities available

through agreement to assist the Federal and State Government agencies." AR 196.

If the Forest Service determines Awardee resources are needed, a dispatcher will call the first firm on the Dispatch Priority List. AR 49 (§ D.6.3). If the Awardee is willing and able to respond within the time frame specified by the dispatcher, the Awardee may accept the assignment. AR 50 (§ D.6.5). If not, the dispatcher calls the next firm on the Dispatch Priority List, working his or her way down the list until an Awardee accepts the assignment. AR 50 (§ D.6.5). Although the Forest Service anticipates using this procedure to acquire Awardee resources, the terms of the BPAs also identify reasons why a dispatcher may deviate from the Dispatch Priority List, such as when fire conditions require a variation in order to respond effectively. AR 48 (§ D.6.1).

If a dispatch center's Dispatch Priority List is depleted, the dispatch center may use another center's Dispatch Priority List. AR 49 (§ D.6.3). Other federal agencies may use the BPAs to contract with Awardees as well. AR 34(§ B).

### B. *Procedural History*

ICP filed a protest with the United States Government Accountability Office ("GAO") concerning the proposed terms of the Region 6 Solicitation on November 20, 2010.[8] AR 746. On December 17, 2010, ICP filed a pre-award protest in this court, which included a challenge to the Region 6 Solicitation (docket entry 1), and the GAO dismissed ICP's pre-award protest pursuant to 4 C.F.R. § 21.11(b) (2010) ("GAO will dismiss any case where the matter involved is the subject of litigation before, or has been decided on the

---

given to those with the lowest price. AR 49 (§ D.6.2). If there are no HUBZone and SDVOSB concerns available, orders will be issued to small businesses with priority given to those with the lowest price. AR 35(§ B).

After conducting market research, the Forest Service made only one set aside award for SDVOSB concerns in the Region 3 CSU solicitation. AR 475. Plaintiff initially challenged the Forest Service's decision not to set aside awards for SDVOSB concerns in other regions, Compl. at ¶ 53, but has since withdrawn that claim.

Pl.'s Mem. on Claims at 3–4 (docket entry 20, Jan. 15, 2011).

8. ICP also filed agency protests concerning both the Region 3 and Region 6 Solicitations. AR 487–88 (Region 3); AR 737–38 (Region 6). The Region 6 agency protest was denied by the contracting officer. AR 742–44. After ICP filed this action, the Region 3 agency protest was dismissed because the Forest Service determined that ICP's agency protest and its case before this Court involved substantially the same issues. AR 495.

merits by, a court of competent jurisdiction."). AR 769.

■ Plaintiff has moved for judgment on the administrative record pursuant to Rule 52.1(c) of the Rules of the Court of Federal Claims ("RCFC") asserting the following four claims: (1) the BPAs only require Awardees to perform if they are "willing and able" in violation of 48 C.F.R. § 13.303–3(a)(1); (2) the Forest Service's decision to compete non-binding BPAs and its proposed method of evaluation violate the requirements for efficiency and economy in contracting; (3) the use of Agency Cooperators violates federal law by giving a preference to governmental agencies over private contractors; and (4) the Region 1 Solicitation incorporates provisions of state law in violation of the Supremacy Clause of the United States Constitution.[9] Pl.'s Br. in Supp. of Mot. for J. on AR at 3 (docket entry 21–2, Jan. 21, 2011) ("Pl.'s Mot."). Plaintiff also moved for declaratory and injunctive relief, as well as money damages. Compl. at 49–53. Defendant filed a cross-motion for judgment on the administrative record and responded to plaintiff's motion on February 11, 2011 (docket entry 24) ("Def.'s Mot."). The Court heard oral argument on both parties' motions on March 4, 2011. A subsequent hearing was conducted on March 14, 2011, focusing on plaintiff's allegations relating to competitive disadvantage, prejudice, and standing to assert the claims raised in this case ("Mar. 14, 2011 Hr'g").[10]

## II. Standard of Review

■ Under 28 U.S.C. § 1491(b)(1), the court reviews a pre-award bid protest to determine whether the agency's actions were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Banknote Corp. of Am. v. United States*, 365

F.3d 1345, 1350 (Fed.Cir.2004); *see also* 28 U.S.C. § 1491(b)(4) (incorporating standard of review from the Administrative Procedure Act, 5 U.S.C. § 706). To meet this standard the protestor must show both that an error occurred and that the error was prejudicial. *Bannum, Inc. v. United States*, 404 F.3d 1346, 1351 (Fed.Cir.2005).

■ In reviewing cross-motions for judgment on the administrative record, the court must determine "whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record." *A & D Fire Prot., Inc. v. United States*, 72 Fed.Cl. 126, 131 (2006). In a manner "akin to an expedited trial on the paper record," the court will make findings of fact where necessary. *Bannum*, 404 F.3d at 1356.

## III. Standing

■ In bid protest cases, a plaintiff seeking to establish standing must demonstrate that it is an "interested party." *Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1359 (Fed.Cir.2009). A plaintiff is an interested party if it " '(1) is an actual or prospective bidder and (2) possess[es] the requisite direct economic interest.'" *Id.* at 1361 (quoting *Rex Serv. Corp. v. United States*, 448 F.3d 1305, 1307 (Fed.Cir.2006)). To establish the second prong, a plaintiff must demonstrate "prejudice," *id.* at 1361, which in pre-award protests, means a "non-trivial competitive injury" that can be redressed by judicial relief. *Id.* at 1361 (quoting *WinStar Commc'ns, Inc. v. United States*, 41 Fed.Cl. 748, 763 (1998) (internal quotation marks omitted)); *accord Labatt Food Serv.*, 577 F.3d at 1378 ("[T]he question of prejudice goes directly to the question of standing . . . ." (quoting *Info. Tech. & Applications*

9. Initially, plaintiff also challenged the solicitations on the ground that certain specifications for the CSUs were unclear. Compl. at ¶ 51. Plaintiff has since withdrawn this claim. Pl.'s Mem. on Claims at 3–4 (docket entry 20, Jan. 15, 2011).

10. Neither party raised the standing issue in its briefs. Accordingly, the Court issued an Order (docket entry 31, Mar. 10, 2011) scheduling the March 14 hearing to consider standing. The

Court's March 10, 2011 Order directed the parties to be prepared to respond to certain specific questions relating to standing. The Court raised the issue *sua sponte* because standing is a jurisdictional requirement and a plaintiff's lack of standing "precludes a ruling on the merits." *Media Techs. Licensing, LLC v. Upper Deck Co.*, 334 F.3d 1366, 1370 (Fed.Cir.2003); *accord Labatt Food Serv. Inc. v. United States*, 577 F.3d 1375, 1378 (Fed.Cir.2009).

*Corp. v. United States,* 316 F.3d 1312, 1319 (Fed.Cir.2003))).

Applying these standards, the Federal Circuit and this court have required pre-award bid protestors, in cases such as this one, to demonstrate that the solicitation would prejudice them by imposing a significant competitive disadvantage. *E.g., Weeks,* 575 F.3d at 1362; *Google, Inc. v. United States,* 95 Fed. Cl. 661, 674 (2011) (holding protestor had standing because it had been "deprived of the opportunity to compete"); *Camden Shipping Corp. v. United States,* 89 Fed.Cl. 433, 436 (2009) (noting that in a pre-award bid protest, "to demonstrate prejudice, the plaintiff must allege a non-trivial competitive injury which can be redressed by judicial relief" (internal quotation marks omitted)); *cf. CS–360, LLC v. United States,* 94 Fed.Cl. 488, 495 n. 6 (2010) (declining to apply "non-trivial competitive injury" standard in pre-award protest because "offers were submitted and plaintiff was the lowest bidder").

In *Weeks,* the plaintiff challenged the Government's proposed procedure for soliciting dredging and shore protection projects. *Weeks,* 575 F.3d at 1354–55. The challenged procedure would have guaranteed Weeks only $2500, but under the alternative method, there was a substantial chance that Weeks would receive an award for a significant portion of nearly $1.4 billion in projects. *Id.* at 1362. On that basis, the court concluded that Weeks had alleged a "non-trivial competitive injury" and had standing because "the solicitation prevent[ed] Weeks from competing" for the nearly $1.4 billion in awards. *Id.* (internal quotation marks omitted).

In this case, there is no dispute that plaintiff "is an actual or prospective bidder." Because plaintiff has submitted bids in response to all seven solicitations, March 14, 2011 Hr'g at 1:56, it is an "actual bidder" with respect to all four of its claims. *See supra* Section I.B. However, the requirement that plaintiff "possess the requisite direct economic interest" because it would incur a "non-trivial competitive injury which can be redressed by judicial relief," is very much in question. Plaintiff's complaint states that the allegedly unlawful solicitation terms are "prejudicial"

but provides little explanation for those assertions. Because the Court may make "factual findings from the record evidence as if it were conducting a trial on the record," *Bannum,* 404 F.3d at 1354, such conclusory allegations are insufficient. The Court therefore analyzes the briefs and record to determine whether plaintiff has adequately established that it will sustain a "non-trivial competitive injury" with respect to each of its four claims.

### A. Effect of the BPAs' "Willing and Able" Provision

Plaintiff claims that the BPAs' "willing and able" terms impose a competitive injury in violation of the FAR by allowing competing contractors to remain on the Dispatch Priority List, despite repeatedly refusing work orders. Mar. 14, 2011 Hr'g at 1:57, 2:08. Permitting contractors to refuse work at their sole discretion, plaintiff argues, allows them to submit unreasonably low fixed-price bids, thereby placing those contractors higher than plaintiff on the Dispatch Priority Lists, even though the competing contractors lack the intention and/or ability to perform when the Forest Service calls upon them. *Id.* Under plaintiff's theory, these "lowball" bids, in turn, force plaintiff to lower its own fixed-price bid to compete effectively, reducing its revenue. *Id.*

The Court is unconvinced by plaintiff's theory of competitive injury with respect to this claim. Most importantly, the theory appears to be based on speculation: plaintiff provides no support for its notion that holders of BPAs have behaved in this manner in the past or that they will do so in the future. Indeed, it seems that such behavior would be irrational. First, it is unclear why any firm would incur the expense of submitting a bid too low to allow it to accept Forest Service work orders. Second, a firm that is typically "willing and able" to perform, as plaintiff claims it is, would not be injured, but rather *benefitted* by such behavior. Even if, as plaintiff postulates, other firms *were* to receive higher Dispatch Priority List placements due to "lowball" bids and then regularly declined to accept orders, such firms would gain nothing, and, once they had repeatedly declined

work, the Forest Service would presumably offer that work—and future work—to a "willing and able" firm such as plaintiff. As a result, the "willing and able" language will likely result in plaintiff's receiving *more* work than it would if all holders of BPAs were contractually bound to perform when they received an order.

■ For this reason, plaintiff's primary argument for standing on this claim—that other contractors' so-called "lowball" bids will force it to lower its own bids—is not persuasive. The number of awards under the solicitations is not capped, *i.e.*, all bidders offering technically acceptable resources at a reasonable price will receive BPAs. AR 35(§ B). Therefore, provided plaintiff meets the technical and price criteria, it will receive a BPA and be placed on the Dispatch Priority List. The participation of "lowball" bidders who receive high positions on the Dispatch Priority List but who do not accept work orders should not affect plaintiff's ability to compete.

Plaintiff relies on *Northeastern Florida Chapter of Associated General Contractors of America v. City of Jacksonville ("General Contractors")* for the proposition that, to establish standing, a plaintiff need only show that it has been treated differently from others. Mar. 14, 2011 Hr'g at 2:19–22 (citing 508 U.S. 656, 666, 113 S.Ct. 2297, 124 L.Ed.2d 586 (1993)). *General Contractors* involved standing to raise an Equal Protection claim and is inapposite here. Plaintiff here cannot show that it has been, or will be, "deni[ed] . . . equal treatment," *Gen. Contractors*, 508 U.S. at 666, 113 S.Ct. 2297, by either the terms of the solicitation or the Dispatch Priority List work assignment process. Plaintiff asserts that due to its substantial investment in trailers and other equipment, the challenged solicitations impose a disparate impact on it. But any such impact would not be caused by the solicitation, and plaintiff admits that it lacks knowledge as to whether other bidders have made comparable investments. Mar. 14, 2011 Hr'g at 1:58.

Plaintiff has failed to articulate a plausible basis for its position that it would incur a nontrivial competitive injury as a result of the solicitations' "willing and able" terms. The Court therefore concludes that plaintiff lacks standing to assert its first claim, which is based on the "willing and able" language.

## B. Alleged Violations of Efficiency and Economy in Procurement

■ Plaintiff's argument for standing to assert its second claim fares no better. Plaintiff argues that the Forest Service violates federal law by using BPAs, rather than binding contracts, as a procurement vehicle. This procedure, plaintiff claims, fails to promote efficiency and economy in procurement as required by law. Compl. at ¶ 41 (citing 41 U.S.C. § 253(g)(1)). The argument that this procedure injures plaintiff fails on two grounds. First, plaintiff fails to identify specifically how it is economically harmed by this procurement procedure. Indeed, plaintiff's argument is focused more on harm to the Forest Service than to itself. *E.g.*, Mar. 14, 2011 Hr'g at 3:31. Second, even to the extent the procedure may negatively affect plaintiff, the procedure similarly burdens all would-be contractors. As discussed, a plaintiff is required to show not just injury, but *non-trivial competitive* injury, to establish standing. *Weeks*, 575 F.3d at 1361 (emphasis added); *see also Labatt Food Serv.*, 577 F.3d at 1380 (holding that plaintiff lacked standing where it made "no showing of how the government's error caused [plaintiff] to suffer *disparate* treatment" (emphasis added)). Here, plaintiff has not shown how use of the BPAs in issue imposes any particularized competitive economic injury upon it. Plaintiff therefore lacks standing to assert its second claim, which relates to the Forest Service's alleged failure to comply with requirements of efficiency and economy in its solicitation and evaluation of bids.

## C. Use of Agency Cooperators

Plaintiff's argument in support of its standing to assert its third claim is based on the argument that it has incurred competitive economic injury because of the Forest Service's use of Agency Cooperators. By using the resources of public Agency Cooperators in lieu of those of Awardees, the Awardees—including plaintiff—may receive fewer orders

than they otherwise would. Plaintiff further argues that Agency Cooperators are not bound by the same labor laws and regulations applicable to private Awardees, thus unfairly advantaging the Agency Cooperators vis-à-vis entities like plaintiff in their ability to provide cost-effective services. Mar. 14, 2011 Hr'g at 2:27–30. Defendant responds that because the policy with respect to Agency Cooperators affects all other private contractors similarly, plaintiff cannot show the requisite *competitive* injury.

Defendant, however, provides no authority for the proposition that competitive injury is limited to injury vis-à-vis other *private contractors* who are competing for orders. *Weeks* requires that a bidder have a "direct economic interest," 575 F.3d at 1359, that is subjected to "non-trivial competitive injury" by the challenged procurement, *id.* at 1361. Where, as here, the solicitation contemplates placing orders that might otherwise have gone to plaintiff with competing entities, private or public, plaintiff stands to incur a non-trivial competitive economic injury. Accepting, *arguendo*, plaintiff's substantive arguments on this issue, although plaintiff will likely obtain a BPA, it will ultimately be "deprived of the opportunity to compete," *Google, Inc.*, 95 Fed.Cl. at 674, for lucrative contracts on a level playing field with its public-sector competitors. *Cf. id.* Plaintiff has therefore adequately shown a competitive injury and thus has established standing to pursue its third claim.

### D. Alleged Violations of the Supremacy Clause

Finally, plaintiff's argument for standing to raise its Supremacy Clause claim fails. At the March 14, 2011 hearing, plaintiff's counsel hypothesized that the terms of the solicitations might force plaintiff and other contractors to comply with conflicting provisions of state and federal law. Mar. 14, 2011 Hr'g at 3:26–29. Plaintiff, however, has not provided persuasive evidence to that effect. Moreover, even if a challenged state-law provision would impose some legal or logistical burden on plaintiff, that burden would likely fall on all other holders of BPAs as well. Plaintiff has not suggested that it

would bear any such burden disproportionately, nor has it explained why the inclusion of such provisions would impose a significant economic injury. Plaintiff is required to show not just injury, but *non-trivial competitive* injury, and it has failed to do so with regard to its Supremacy Clause claim. *Cf. Labatt Food Serv.*, 577 F.3d at 1380 (holding that "an improper deviation from the solicitation" was insufficient to confer standing where that error "equally [affected] all offerors[,] harming none").

In sum, the Court concludes that plaintiff has standing to bring only its third claim, which is based on the authorization to use Agency Cooperators in lieu of Awardees. The Court will consider the merits of that claim below. *See infra* Section IV.C. As discussed above, a plaintiff's failure to establish standing "precludes a ruling on the merits," *Media Techs. Licensing*, 334 F.3d at 1370. Nonetheless, for the sake of judicial economy—and because awards under the challenged solicitations are imminent, and expeditious resolution of this action is critical—the Court will consider, in the alternative, plaintiff's arguments on the merits with respect to its other three claims as well. *See infra* Section IV.A., C., & D.; *HomeSource Real Estate Asset Servs., Inc. v. United States*, 94 Fed.Cl. 466, 482 (2010); *see also* 28 U.S.C. § 1491(b)(3).

### IV. Merits Discussion

#### A. Although the BPAs Do Not Impose Binding Obligations on the Awardees, They Are Authorized Procurement Vehicles (**Plaintiff's First Claim**).

Plaintiff first claims that the BPAs are invalid procurement vehicles because they purport to operate as non-binding agreements while in this case they actually impose, or should impose, binding, contractual obligations. Plaintiff's contention rests on the following reasoning: although BPAs are generally not contracts, these BPAs and 48 C.F.R. § 13.303–3(a)(1) impose obligations on Awardees to perform when orders are placed, which make these BPAs binding contracts, and, therefore, the terms of the solicitations that purport to make the BPAs non-binding are contrary to law. Analyzing each

of these contentions in turn, the Court concludes that the BPAs at issue in this case do not violate any law or regulation and are authorized procurement vehicles.

### 1. The BPAs at Issue in This Case Are Not Contracts.

As described in applicable procurement regulations, BPAs are not contracts. *See* 48 C.F.R. § 13.303-3(a)(2) (2010); *Zhengxing v. United States*, 71 Fed.Cl. 732, 738 n. 20 (2006) (Williams, J.), *aff'd*, 204 Fed.Appx. 885 (Fed.Cir.2006); *see also* 48 C.F.R. § 13.004(a) (2010). Rather, the BPAs at issue are agreements that set forth the terms and conditions of future contracts that are formed once the Government places an order and the holder of the BPA accepts.[11] *Zhengxing*, 71 Fed.Cl. at 738 n. 19; *see also* 48 C.F.R. § 13.303-3(a)(2) (2010) ("[T]he Government is obligated only to the extent of authorized purchases actually made under the BPA."). The BPAs at issue here state that placement of orders is not guaranteed and holders of the BPAs are required to accept orders only to the extent they are willing and able to do so. AR 34(§ B). The latter language has been held by the Federal Circuit to negate the existence of a binding contract. *See Ridge Runner Forestry v. Veneman*, 287 F.3d 1058, 1061–62 (Fed.Cir. 2002) (holding that a tender agreement, which included language nearly identical to the BPAs in this case, was not a contract).

### 2. Neither the Terms of the BPAs Nor the Provisions of the FAR Require Awardees to Perform Before an Order Is Placed and Therefore Do Not Convert These BPAs into Binding Contracts.

The second part of plaintiff's argument that the BPAs are, or should be, contracts rests on the assertion that the terms of the BPAs and provisions of the FAR require Awardees to undertake substantial performance prior to orders being placed. Pl.'s Mot. at 27. Plaintiff highlights several provisions in the solicitations that it claims require substantial performance prior to any order being placed. Pl.'s Reply at 5–7. Furthermore, plaintiff argues that the FAR itself obligates Awardees to perform upon the Forest Service's request, in direct conflict with defendant's position that these BPAs are non-binding until an order is placed and accepted by the Awardee. Pl.'s Reply at 5–6 (citing 48 C.F.R. § 13.303-3(a)(1) (2010) ("[T]he supplier shall furnish supplies or services ... if and when requested by the contracting officer...."")). According to plaintiff, complying with certain terms of the solicitations relating to preparatory activity by Awardees amounts to acceptance of an offer by substantial performance sufficient to create binding contractual obligations. Pl.'s Reply at 5, 7–8 (citing 48 C.F.R. § 13.004(b) (2010) and RESTATEMENT (SECOND) OF CONTRACTS § 87(2)).

#### a. Performance Required by the Terms of the BPAs

Plaintiff claims the terms of the BPAs impose significant obligations on Awardees to perform prior to any order being placed. Specifically, plaintiff notes that Awardees are bound by the prices submitted with their bids, which may be modified only at the annual review. Pl.'s Mot. at 26–27; *see also* AR 41 (§ C.3.1) ("An annual review will be conducted and at that time, Contractors will be offered an opportunity to adjust their prices."). Also, Awardees are required to maintain their availability status with their host dispatch center and may modify resources only with the CO's approval. Pl.'s

---

**11.** The Government also relies upon *Modern Systems Technology Corp. v. United States*, 24 Cl.Ct. 360 (1991), *opinion adopted*, 979 F.2d 200 (Fed. Cir.1992), in support of the proposition that BPAs are not contracts, but contracts are formed when the Government places orders pursuant to the BPAs and those orders are accepted by the holders of the BPAs. Def.'s Mot. at 8. Plaintiff asserts, however, that *Modern Systems* is not controlling because it dealt with blanket agreements rather than BPAs. Pl.'s Reply Br. in Opp'n to Def.'s Cross–Mot. for J. on the AR at 3 (docket entry 25-1, Feb. 15, 2011) ("Pl.'s Re-

ply"). According to plaintiff, this difference is significant because the BPAs at issue in this case effectively exclude those who do not participate in the solicitation process from future business for a three-year period, while blanket agreements do not have the same exclusionary effect. Pl.'s Reply at 3. The Court agrees with Judge Williams' conclusion in *Zhengxing* that *Modern Systems* demonstrates that basic agreements and basic purchase agreements "have the same legal import ... in that neither instrument itself is a contract." *Zhengxing*, 71 Fed.Cl. at 738 n. 19.

Reply at 4; *see also* AR 48 (§ D.5) AR 58 (§ D.22).[12] Plaintiff claims that complying with these terms is sufficient to establish an enforceable contractual commitment, citing both the RESTATEMENT (SECOND) OF CONTRACTS § 87(2) and *Hoel–Steffen Construction Co. v. United States*, 231 Ct.Cl. 128, 684 F.2d 843 (1982).

Neither of those authorities supports plaintiff's position. *Hoel–Steffen* concerned a telephoned bid submitted by a sub-contractor, which was enforced when it was incorporated into a prime contractor's offer. 684 F.2d at 844–45. Section 87(2) of the Restatement provides: "An offer which the offeror should reasonably expect to induce action or forbearance of a substantial character on the part of the offeree before acceptance and which does induce such action or forbearance is binding as an option contract to the extent necessary to avoid injustice." Plaintiff does not adequately explain either how the pre-award standards imposed by the BPAs require action of a "substantial character" or why Awardees' obligation to maintain their availability status with the HDZs should be considered a binding acceptance "to avoid injustice."

Furthermore, both § 87(2) of the Restatement and *Hoel–Steffen* are predicated on conduct operating as acceptance of an offer. In *Hoel–Steffen*, the quotations at issue were offers. 684 F.2d at 848. But the BPAs at issue in this case are not offers, so any performance on the part of Awardees cannot be acceptance because there is no offer to accept. *See* 48 C.F.R. § 13.004(a) (2010); *Primary Metal & Mineral Corp. v. United States*, 556 F.2d 507, 509 (Ct.Cl.1977).

Plaintiff also argues that § 13.004(b) supports its contention regarding acceptance by substantial performance. It provides that "a supplier may indicate acceptance by furnishing the supplies or services ordered or by proceeding with the work to the point where substantial performance has occurred." However, this provision must be considered in the context of the previous provision, § 13.004(a), which provides that:

> A quotation is not an offer.... [I]ssuance by the Government of an order in response to a supplier's quotation does not establish a contract. *The order is an offer by the Government to the supplier....* A contract is established when the supplier accepts the offer.

(Emphasis added). Reading the two provisions together, it is clear that under the terms of the FAR an offer is made only when the Government places an order, and no contract is formed until the holder of the BPA accepts the order.

### b. Performance Required by § 13.303–3(a)(1)

Plaintiff also relies on 48 C.F.R. § 13.303–3(a)(1) (2010), which provides that the following term is mandatory in BPAs: "A statement that the supplier shall furnish supplies or services ... if and when requested by the contracting officer...." Plaintiff claims that the solicitation clauses that permit Awardees to accept orders only to the extent they are "willing and able" are illegal because § 13.303–3(a)(1) imposes an obligation on Awardees to perform regardless of the terms of the BPAs.

The performance required by § 13.303–3(a)(1) is conditioned upon the phrase "if and when requested by the contracting officer." Once a CO requests performance by placing an order and the Awardee accepts, then § 13.303–3(a)(1) requires an Awardee to perform. The solicitations permit the CO to issue an order requiring an Awardee to furnish resources only when that Awardee is willing and able to do so and accepts the order. "These FAR provisions, when read as a whole and in conjunction with the terms of the solicitation," demonstrate that a CO will determine an Awardee's willingness and ability to perform prior to any order being placed. *Tip Top Constr., Inc. v. United*

---

12. Plaintiff also contends that Awardees will have to hold the resources in discrete locations once the BPAs are awarded. Pl.'s Reply at 7. However, the BPAs impose no such requirement. *See* AR 231 (solicitation form requiring basic information about the CSU, including location); AR 480–81 (question and answer sheet for CSU Region 3 solicitation which provides that if a dispatch is placed outside of a vendor's HDZ and the vendor does not believe the daily rate covers the costs for dispatch, then the vendor has the option of not accepting the order).

*States,* No. 08–352C, 2008 WL 3153607, at *22 (Fed.Cl. Aug. 1, 2008). Therefore, § 13.303–3(a)(1) does not impose any obligations on Awardees that are greater than or contrary to the terms of the solicitations.[13]

Plaintiff's argument that the terms of the BPAs and 48 C.F.R. § 13.303–3(a)(1) impose legal obligations on Awardees to perform when orders are placed is without merit because the BPAs cannot be read as offers and § 13.303–3(a)(1) does not require Awardees to perform until an order is placed and accepted. Therefore, plaintiff has not met its burden of demonstrating that the BPAs at issue in this case are contrary to law.

B. *Neither the Forest Service's Decision to Compete Non–Binding BPAs Nor the Forest Service's Method of Evaluating Bids Violates the Requirement for Efficiency and Economy in Contracting* (*Plaintiff's Second Claim*).

██ With respect to the merits of its second claim, plaintiff argues that, even though the Forest Service competed the BPAs, the solicitations are in violation of law because they do not promote efficiency and economy. Pl.'s Reply at 9 (citing a provision of the Competition in Contracting Act, 41 U.S.C. § 253(g)(1)). Plaintiff first contends that the use of BPAs violates the statutory requirement to foster efficiency and economy in contracting because BPAs are not contracts. Pl.'s Reply at 9. As support for this conclusion, plaintiff cites 41 U.S.C. § 253(g)(4), which requires agencies to use competition to the maximum extent practicable. Pl.'s Reply at 9. Plaintiff contends that the result of such competition must be contracts because the procurement statutes require that contracts be competed. Second, plaintiff argues that the BPAs do not foster efficiency and economy in contracting as required by § 253(g)(1) because the reasonable price, technically acceptable evaluation of bids is illusory.

Plaintiff's first argument rests on an untenable reading of statutory language. Plaintiff cites 41 U.S.C. § 403(5), which defines "competitive procedures" as "procedures under which an agency enters into a contract pursuant to full and open competition." Plaintiff contends that § 403(5) requires that when an agency uses competitive procedures, a contract must be awarded. Then, plaintiff cites to 41 U.S.C. § 427(c), which provides that agencies must "promote competition to the maximum extent practicable." Therefore, plaintiff contends that because § 427(c) requires agencies to promote competition, and competition pursuant to § 403(5) must involve the use of competitive procedures resulting in contracts, the competition of these BPAs by the Forest Service must result in contracts rather than nonbinding BPAs.

Nothing in the FAR prohibits the Government from competing BPAs to establish multiple agreements with multiple vendors. Section 427(c), which plaintiff cites, supports the Forest Service's decision to compete BPAs to "promote competition to the maximum extent practicable." Furthermore, 48 C.F.R. § 13.303–2(c)(1) specifically contemplates that BPAs may be established with multiple suppliers. Competing BPAs ensures that the Government meets its goals of efficiency and economy in obtaining its requirements, as well as promoting competition to the maximum extent practicable. 41 U.S.C. § 253(g)(1) & (4); *see also* Def.'s Reply Br. in Supp. of Its Cross–Mot. for J.

---

13. BPAs must include both a provision allowing Awardees not to perform if they so choose and the § 13.303–3(a)(1) language requiring Awardees to perform once a CO requests and the Awardee accepts. In *International Maintenance Resources, Inc.,* ASBCA No. 49789, 1996 WL 635303, the agreement at issue included the language from § 13.303–3(a)(1) but did not include a clause allowing the Awardee to accept the Government's offer only when it was willing and able to perform. Despite the Government's contention that the agreement was a BPA because the Awardee was not required to perform at the Government's request, the ASBCA found that the Awardee was required to perform pursuant § 13.303–3(a)(1) because the agreement did not contain a clause requiring the Awardee to perform only if it were willing and able to do so. Without this escape clause, the ASBCA found that the agreement at issue was not a BPA, but was instead an indefinite quantity requirements contract. This case supports the Court's conclusion that the "willing and able" language in the BPAs at issue here is not inconsistent with § 13.303–3(a)(1).

Upon the AR at 6 (docket entry 26, Feb. 25, 2011) ("Def.'s Reply").

Plaintiff next argues that the provisions that bind Awardees only to the extent they are willing and able to perform make any evaluation of bids illusory.[14] That Awardees need only perform to the extent they are willing and able does not hinder the CO's ability to evaluate the offerors' price, technical competence, and responsibility. The bidders must submit a fixed price that will be incorporated into any order placed pursuant to the BPA and may be adjusted only during the annual review. AR 41 (§ C.3.1).

Plaintiff contends that the BPAs here are analogous to the ID/IQ contracts in *Magnum Opus Technologies, Inc. v. United States*, 94 Fed.Cl. 512 (2010), because any price evaluation would be conducted on prices that are not binding on the Awardees. However, plaintiff's case is different from *Magnum Opus*. In that case price evaluation was initially based on "Not to Exceed" rates, but the requirement to propose such rates was later eliminated, leaving absolutely no prices to compare. 94 Fed.Cl. at 541–42. Here offerors are required to submit prices, and COs can evaluate those prices against one another and against the reasonable price standard.[15]

In this case, plaintiff has failed to meet its burden of showing a clear violation of the duty to foster efficiency and economy in contracting. There is no statutory requirement that promoting competition compels an award of a contract rather than the award of a non-binding BPA. Furthermore, plaintiff failed to show that the Forest Service's price evaluation plan violated either the statutory directive to promote competition or the directive to achieve efficiency and economy in contracting to obtain the Government's requirements.

## C. The Use of Agency Cooperators Does Not Violate Federal Law Giving Preference to Local Firms *(Plaintiff's Third Claim).*

Plaintiff's third claim is that these BPAs violate federal law because they allow the Forest Service to enter into cooperative agreements with Agency Cooperators in violation of the Federal Grant and Cooperative Agreement Act, 31 U.S.C. §§ 6301–6308.[16] Pl.'s Mot. at 35. According to plaintiff, agreements with a principal purpose of acquiring "property or services for the United States Government" must be contracts, so any agreement that the Forest Service would enter into with Agency Cooperators must be publically competed.[17] Pl.'s Mot. at 35 (quoting 31 U.S.C. § 6303(1)).

Defendant contends that the Forest Service is given statutory authority to enter into reciprocal fire protection agreements with Agency Cooperators pursuant to the Reciprocal Fire Protection Act, 42 U.S.C. § 1856a. In pertinent part, that statute provides, "Each agency head charged with the duty of providing fire protection for any property of

---

14. Plaintiff asserts that the solicitations will encourage bidders to bid unreasonably low prices knowing they will never be bound to perform at these prices because they can refuse to accept any orders. *See supra* Section III.A.

15. Plaintiff also argues that a responsibility determination necessitates that the contractor have a contract, not a non-binding BPA. Responsibility determinations require a finding that an Awardee have the necessary resources, which is evidenced by "a commitment or explicit arrangement, that will be in existence at the time of [the] contract award." 48 C.F.R. § 9.104–3(a) (2010); Pl.'s Reply at 12. Section 9.104–3(a) requires only that the CO obtain acceptable evidence that a prospective contractor will be able to obtain required resources once a contract is formed. It does not require that a contract with the Government already have been awarded, which is evi-

denced by the use of the term "prospective contractor" in § 9.104–3(a).

16. At the March 14 hearing, plaintiff withdrew its claim that the use of Agency Cooperators violated the Stafford Act, 42 U.S.C. § 5150(a)(1).

17. Plaintiff also argued that the solicitations provided that COs could modify the Dispatch Priority Lists at will. Pl.'s Mot. at 31. As defendant explained, the part of the solicitations dealing with the Dispatch Priority Lists included the term "may modify accordingly," but that language referred to modifying language of the template, not the Dispatch Priority Lists, and was inadvertently included in the solicitations. *See* Def.'s Mot. at 16–17. Therefore, plaintiff's argument is mistaken because the solicitations do not permit COs to modify the Dispatch Priority Lists at will.

the United States is authorized to enter into a reciprocal agreement, with any fire organization maintaining fire protection facilities ... [and] for mutual aid in furnishing fire protection...." 42 U.S.C. § 1856a(a). As used in § 1856a(a), the term "fire protection" is defined as "equipment required for fire prevention, the protection of life and property from fire, fire fighting, and emergency services." 42 U.S.C. § 1856(b). Plaintiff, however, argues that "equipment" as used in § 1856(b), the statutory definition of "fire protection," includes only fire engines, not units of the type being solicited in this case. Pl.'s Reply at 14.

 When evaluating an agency's construction of a statute, the court must first ask "whether Congress has directly spoken to the precise question at issue." *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). If so, the Court gives effect to the express words of Congress. *Id.* If, however, Congress is silent or has left the statute "ambiguous with respect to the specific issue," then the Court will examine "whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843, 104 S.Ct. 2778. The Court will defer to the agency's construction if it "reflects a plausible construction of the plain language of the statute and does not otherwise conflict with Congress' express intent." *Rust v. Sullivan,* 500 U.S. 173, 184, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991) (citing *Chevron,* 467 U.S. at 842–43, 104 S.Ct. 2778).

Section 1856(b) provides a broad definition of fire protection to include equipment required for fire prevention and fire fighting. Plaintiff provides no support for its contention that the definition of "equipment" in § 1856(b) should be limited to fire engines. The Government's position that equipment for fire fighting includes units similar to those being solicited is a permissible and eminently reasonable construction of the Re-

ciprocal Fire Protection Act. Absent evidence to the contrary, the Court declines to read the statute as narrowly as plaintiff suggests. Rather, the Court will defer to the agency's reasonable construction of the statute as granting the Forest Service authority to enter into reciprocal fire protection agreements with Agency Cooperators.

To the extent that § 1856a may appear to conflict with the Federal Grant and Cooperative Agreement Act, the specific statutory language should prevail over the general. *See Prof'l Pilots Fed'n v. FAA,* 118 F.3d 758, 763 (D.C.Cir.1997) ("The general prohibition of the ADEA, addressed as it is to employers, should not be read by mere implication to override the specific grants of authority to the FAA...."); *Fourco Glass Co. v. Transmirra Prods. Corp.,* 353 U.S. 222, 228–29, 77 S.Ct. 787, 1 L.Ed.2d 786 (1957) ("Specific terms prevail over the general in the same or another statute which otherwise might be controlling." (internal quotation marks omitted)). Therefore, the general provisions of the Federal Grant and Cooperative Agreement Act, which govern what may be considered a cooperative agreement, do not apply to Forest Service agreements with Agency Cooperators because the Forest Service is given specific statutory authority in the Reciprocal Fire Protection Act to enter into such agreements.[18]

**D. The Region 1 Solicitation Does Not Violate the Supremacy Clause (Plaintiff's Fourth Claim).**

Moving to a consideration of the merits of plaintiff's fourth claim, the Region 1 Solicitation anticipates that the Dispatch Priority List may be utilized by both the Forest Service and state agencies. AR 233. Exhibit H to the solicitation includes the specific terms that will govern any agreement that a state may enter into with an Awardee by issuing an order pursuant to the BPA that is accepted by the Awardee. AR 220–22 (Mon-

---

18. Plaintiff also argued that the agreements were not reciprocal agreements because they did not create reciprocal duties on the parties to provide firefighting assistance to each other. Mar. 14, 2011 Hr'g at 3:15. Plaintiff supplies no support for this proposition, but the agreement cited by defendant specifically states that it is for "[t]he exchange of personnel, equipment, supplies, services, and funds among the Agencies." Def.'s Mot. at 16 n.3 (citing the Idaho Cooperative Fire Protection and Stafford Act Response Agreement at 2 (http://www.fs.fed.us/r1/fire/nrcg/Op_plans/07_12_ID_Final_Coop_Agreement.pdf)).

tana); AR 222–27 (Idaho). Plaintiff claims that the acceptance of these state terms violates the Supremacy Clause of the United States Constitution by incorporating state law into federal contracts. Pl.'s Mot. at 36–37 (citing U.S. CONST., art. VI, cl. 2). In addition, plaintiff argues that the Forest Service does not have the statutory authority to solicit agreements pursuant to which states may also place orders. Pl.'s Reply at 17.

Defendant contends that any order placed by a state pursuant to a BPA does not implicate the Supremacy Clause because any such order would lead to a contract between the state and the Awardee. Def.'s Mot. at 18. Defendant relies upon the analogous practice of the General Services Administration ("GSA"), permitting state and local governments to contract with private parties for items including firefighting and rescue equipment that are available on the Federal Supply Schedules ("FSS"), 40 U.S.C. § 502(c)(1)(B). In turn, plaintiff argues that § 502(d)(3) supports the conclusion that when an order is placed by a state through the FSS, the result is a federal contract. Pl.'s Reply at 18. However, § 502(d)(3) provides that state and local government orders are accepted only on a voluntary basis and says nothing about whether such contracts would be considered federal contracts governed by federal law. Indeed, the GSA does not consider such orders to be federal contracts governed by federal law. *See* Def.'s Reply at 10 (citing Cooperative Purchasing FAQ, http://www.gsa.gov/portal/content/202313#12 (stating that orders placed by a non-federal entity "constitute[ ] the formation of a new contract between the non-federal ordering activity and the Schedule contractor")).[19]

▮▮ At the March 4 hearing, plaintiff specifically focused on a provision in the Idaho terms and conditions that requires Awardees to comply with Idaho minimum wage laws. AR 223 ("It will be the responsibility of the Contractor to fully comply with Section 44–1502, Idaho Code, regarding mini-

mum wage."). Plaintiff contends that this provision in an Idaho order conflicts with the Department of Labor Wage Schedule issued pursuant to the Service Contract Act ("SCA"), which is incorporated into the BPAs. AR 204–09 (Wage Schedule); AR 237 (incorporating the SCA Schedule into the solicitation). However, the federal and state provisions are not contradictory. The SCA mandates the pay and benefits the Awardees must provide, whereas the Idaho terms state only that payment must not be less than that mandated by Idaho's minimum wage law. *See* IDAHO CODE ANN. § 44–1502(a) (stating that the Idaho minimum wage shall track the federal minimum wage). The Idaho provision specifies a minimum compensation level, but the SCA governs the actual pay and benefits required to be paid by the Awardees. Therefore, the minimum wage provision in an Idaho order is not in conflict with the pay and benefits mandated by the SCA, and there is no violation of the Supremacy Clause.

In support of the Forest Service's authority to permit states to place orders pursuant to the BPAs, defendant contends that several statutes create authority for the Forest Service to enter into cooperative agreements with local agencies and argues that this authority is broad enough to encompass permitting state and local entities to place orders pursuant to the BPAs. 16 U.S.C. § 565a–1 ("To facilitate the administration of the programs and activities of the Forest Service, the Secretary is authorized to negotiate and enter into cooperative agreements with public or private agencies . . . to perform forestry protection, including fire protection. . . ."); 42 U.S.C. § 1856a ("Each agency head . . . is authorized to enter into a reciprocal agreement, with any fire organization . . . for mutual aid in furnishing fire protection. . . ."). Plaintiff provides no support for its contention that the Forest Service is prohibited from permitting state agencies to issue orders pursuant to these BPAs. Indeed, the

19. Plaintiff also contends that Awardees under these BPAs are required to fulfill any state order, whereas § 502(d)(3) provides that any state order placed pursuant to the FSS is voluntary. Pl.'s Reply at 18. However, Awardees are not con-

tractually obligated to fulfill any order placed by a state because the terms of the BPAs only require an Awardee to perform to the extent it is willing and able to do so. AR 233; *see also* Def.'s Reply at 9.

plain language of the relevant statutes is to the contrary.

The Court has addressed what it believes to be the most significant of plaintiff's claims—from the point of view of standing and on the merits. In addition, the Court has considered all of what it understands to be plaintiff's other contentions and finds them unpersuasive.

### CONCLUSION

In view of the foregoing, the Court **ORDERS** that plaintiff's first, second, and fourth claims are **DISMISSED** for lack of standing because plaintiff has failed to demonstrate that the solicitations at issue impose on plaintiff a non-trivial competitive injury that can be redressed by judicial relief. In the alternative, assuming *arguendo* that plaintiff has standing with respect to those claims and has shown the requisite competitive injury, the Court **FURTHER ORDERS** that defendant's cross-motion for judgment on the administrative record is **GRANTED** with respect to those claims. With respect to plaintiff's third claim, as to which the Court holds that plaintiff has standing because it has shown the requisite competitive injury, the Court **FURTHER ORDERS** that, defendant having prevailed on the merits of plaintiff's third claim, defendant's cross-motion for judgment on the administrative record is also **GRANTED** with respect to plaintiff's third claim. Plaintiff's motion for judgment on the administrative record is **DENIED**, as are plaintiff's requests for declaratory and injunctive relief and for money damages, including bid preparation and proposal costs. The Clerk is directed to enter judgment accordingly.

Some information contained herein may be considered protected information subject to the protective order entered in this action on January 7, 2011 (docket entry 11). This Opinion and Order shall therefore be filed under seal. The parties shall review the Opinion and Order to determine whether, in their view, any information should be redacted in accordance with the terms of the protective order prior to publication. The Court **FURTHER ORDERS** that the parties shall file, by **Monday, April 4, 2011,** a joint status report identifying the information, if any, they contend should be redacted, together with an explanation of the basis for each of their proposed redactions.

Each party shall bear its own costs.

**IT IS SO ORDERED.**